### PEOPLE v. McLAUGHLIN.

(Supreme Court, Appellate Division, First Department. March 13, 1896.)

1. CRIMINAL LAW—STAY OF TRIAL—ERRONEOUS VACATION—JURISDICTION.
   The court of oyer and terminer has jurisdiction to proceed with a criminal case, on an order of a justice of the supreme court staying the trial being vacated by the special term of the supreme court, though the order of vacation is erroneous, it not being void.

2. JURORS—QUALIFICATION—INTELLIGENCE—REVIEW.
   Whether one meets the requirements of Code Civ. Proc., providing that, in order to be qualified to serve as a trial juror in the city of New York, a person must be "intelligent," rests in the good judgment and sound discretion of the trial judge.

3. SAME—OPINIONS.
   Even if there can be review of the determination of the judge in accepting persons as jurors, under Code Cr. Proc. § 376, subd. 2, providing that an opinion as to guilt or innocence of defendant is not ground of challenge to a person, if he declare, on oath, that he believes such opinion will not influence his verdict, and that he can render an impartial verdict

according to the evidence, and the court is satisfied that he does not entertain such a present opinion as would influence his verdict, the determination cannot be *held* erroneous, merely because the person accepted made some answers apparently inconsistent with his belief, as finally declared, that his opinion would not influence his verdict.

4. INDICTMENT—REFERENCE TO PRIOR COUNTS.

A count under which, alone, the prosecution elected to proceed is not defective as to allegations of time and place, the allegations relative thereto in prior counts being referred to therein, and thus made part of it, and the prior counts being allowed to stand for the purpose of reference.

5. CRIMINAL LAW—EVIDENCE OF SIMILAR CRIMES.

On a prosecution of a police captain for extortion by means of threats, made by B., a ward man in defendant's precinct, for the purpose of proving that B. was defendant's agent in the commission of the crime charged, it is competent to show that, prior to the commission of such crime, during the same and previous years, while they occupied the same official positions, other acts of extortion were committed by means of threats of B.; evidence also being introduced that defendant had practically conceded such agency in such prior transactions.

6. SAME—BOOK ENTRY AS EVIDENCE.

On a prosecution of M., a police captain, for extorting $50 from S., on November 21, 1891, there being evidence that B. was acting as agent of defendant in the matter, an entry in the books of S., in his handwriting, reciting, "Nov. 21, 1891, material paid to M. for protection, per Sergt. B., ordinance officer, $50," is admissible to show the date of the payment, and that it was made to B., S. having been unable, even after looking at the entry, to remember the date of the payment, or whether he made it to M. or B., but having testified that he made the entry at the time, in the regular course of business, and that it correctly stated the facts therein recited, including the date; and it is immaterial that S. expressed doubt as to the meaning of the entry.

7. SAME—REVIEW—OBJECTIONS NOT RAISED BELOW.

An entry in the books of S., "Nov. 21, 1891, material paid to M. for protection, per Sergt. B., ordinance officer, $50," having been offered and admitted on a prosecution of M., a police captain, for extorting money from S., B. being his agent in the matter, for the purpose of showing the date of the payment and to whom made, objection cannot be made, on appeal, for the first time, that the entry contained other matter prejudicial to defendant, in that it was stated therein that the payment was made "for protection."

8. SAME—OBJECTIONS TO INSTRUCTIONS.

Where the court correctly charges that an entry in a book was evidence from which the fact of payment to a certain person could be found, error cannot be predicated of failure to state that it should not be considered on the question of the purpose for which payment was made, there having been no request therefor, but merely an exception to what was said.

9. SAME—HARMLESS ERROR.

Admission of a paper to show that a person, when making a certain statement, had before him but part of an entry in a book, which was given in evidence, if error, is cured by its being stricken out, and the jury being instructed to disregard it.

10. EXTORTION—BRIBERY—EVIDENCE.

Though, under the ordinances, it was the duty of defendant, as captain of police, and of the men under him, to keep persons from obstructing sidewalks, without a permit from the proper department, and a threat by him to do his duty unless a person paid him money, followed by failure to do his duty in consideration of receipt of money, would not be extortion, but bribery, still, where a ward man in defendant's precinct, acting as his agent, told S., who was obstructing a sidewalk in taking down a building, that he must come down and see the captain, and not go ahead with the work till he had, without any suggestion as to absence of a permit, or

duty of policemen, and S., after going to defendant's office and paying $50, went on with the work without molestation, and there was no evidence as to whether S. had a permit, a conviction of extortion was proper.

Appeal from court of oyer and terminer, New York county.

William W. McLaughlin was convicted of extortion, and appeals. Affirmed.

The crime was alleged to have been committed in the city of New York, November 21, 1891, and to have consisted in extorting $50 from one Seagrist, by means of a threat to do an unlawful injury to his property. Pen. Code, §§ 552, 553. The defendant was, at the time, a police captain in the First precinct of the city of New York, and the threat was claimed to have been made by one Burns, who was at the time a ward man in the defendant's precinct. Seagrist had for several years been in the business, in the city of New York, of tearing down old buildings. The indictment was filed March 18, 1895, and in the first four counts charged, in different forms, the crime of bribery, and in the fifth count charged the crime of extortion, in the following language, in brief, "feloniously did obtain $50 in money from Seagrist, a dealer in secondhand building materials, who was lawfully engaged in business as such, and who was engaged in demolishing and tearing down, and causing to be demolished and torn down, a building in the First ward, hiring and employing therein divers laborers and workmen, with his consent, induced by a wrongful use of fear, by means of a threat to do an unlawful injury to his property,—that is, to injure, annoy, harass, and obstruct him in his business, and prevent him from properly, freely, and profitably carrying on such business, and especially to harass, interfere with, obstruct, and impede him while he should be so engaged and employed in demolishing and tearing down such building, and to hinder and prevent him from properly performing the work, labor, and duties necessary and requisite therefor, unless he gave the defendant the $50."

There have been two trials of the defendant under this indictment. The first trial began April 15, 1895, and continued until May 11, 1895, when the jury disagreed, and were discharged. Upon the first trial, at the close of the people's case, the district attorney elected to proceed only upon the fifth count, for the crime of extortion. After the disagreement and discharge of the jury on the first trial, the court directed that the second trial be commenced on Monday, May 20, 1895. On Saturday, May 18, 1895, counsel for the defendant served upon the district attorney notice of an application under section 344 et seq., Code Cr. Proc., to be heard at a special term in New York City, June 3, 1895, to remove the indictment and action from the New York oyer and terminer to the oyer and terminer of some other county, upon the ground that a fair and impartial trial could not be had in the county of New York. With this notice of application was also served an order, made May 17, 1895, by a justice of the supreme court, residing in Brooklyn, staying the trial of the indictment, under section 347, Code Cr. Proc., until such application could be made and decided. Such order staying the trial was indorsed upon the papers, and filed in New York county, as required by section 348. On Monday morning, May 20, 1895, about 7 o'clock, the district attorney served upon defendant's counsel an order, made by a justice of the supreme court residing in New York City, requiring the defendant to show cause in the New York special term, at 10:30 o'clock the same morning, why the time to make such application for removal should not be shortened from June 3, 1895, when it was noticed to be heard, to May 20, 1895, and why the application should not be then and there made and heard. At 10:30 o'clock of that day the defendant appeared, by counsel, before the special term in New York, for the special purpose of objecting, and he did object, to the jurisdiction and power of the court to shorten the time for making the application for removal, or to compel the instant hearing of such application. These objections were overruled by the court, and the defendant was ordered forthwith to make the application for removal. The defendant refused to make the application until the time for which it had been noticed, June 3, 1895. The court, on the application of the district attorney, then denied the application for removal, and

vacated the order staying the trial made by the Brooklyn justice. This order was made and entered, and thereupon the second trial was proceeded with. At the commencement of this second trial the defendant objected to the jurisdiction of the court to proceed, on the ground that the order staying the trial was still in force, and that the New York special term had no power to vacate the stay, and its order doing so was void. This objection was overruled, and the trial was proceeded with. This trial continued until June 8, 1895, when it resulted in a verdict of guilty of the crime of extortion. On June 19, 1895, judgment was rendered that the defendant be imprisoned in the state's prison in Sing Sing, for two years and six months. A certificate of reasonable doubt was made by another justice of the supreme court residing in Brooklyn, and the defendant was thereupon admitted to bail, pending the appeal to this court. A separate appeal was taken from the order made by the New York special term denying the defendant's application to remove the indictment and action to another county for trial, and vacating the order made by the Brooklyn justice staying the trial. That appeal is also before this court, having been argued separately from the appeal from the judgment. Many questions are raised by the defendant upon this appeal from the judgment, and the facts relating to these questions well be referred to in considering the questions themselves.

Argued before VAN BRUNT, P. J., and RUMSEY, WILLIAMS, PATTERSON, and O'BRIEN, JJ.

Edward C. James, Abram I. Elkus, and Edward E. McCall, for appellant.

Daniel G. Rollins, Austin G. Fox, and John D. Lindsay, for the People.

WILLIAMS, J. We have arrived at the conclusion, upon the appeal from the order denying the application to remove the indictment and action to another county for trial, and vacating the order staying the trial, that such order appealed from was erroneous, and should be reversed, but that such order was not void for want of jurisdiction to make it. When that order was made, the proceeding for a removal was terminated, and there was no longer any stay of the trial. So long as such order remained in force and unreversed, it was, therefore, binding upon the court of oyer and terminer, and that court had the power to proceed with the trial. The objection, therefore, taken at the commencement of this trial, that the court had no jurisdiction to proceed, on the ground that the order vacating the order staying the trial was void, and that the order staying the trial was still in force, was not well taken, and was properly overruled. Such ruling was not erroneous. The want of jurisdiction in the court of oyer and terminer to proceed with the trial was the only ground suggested why the trial should not proceed, aside from the engagements of counsel, which were fully provided for by the court. There was no suggestion made even that the defendant desired a postponement of the trial to afford him an opportunity to review the order made by the special term, and the court of oyer and terminer itself had no power to review or pass upon the order of the special term.

Many exceptions were taken by the defendant, on the trial, to the allowance or disallowance of challenges to jurors who were called and examined. The questions raised by these challenges are classified by defendant's counsel under three heads, those relating to

jurors (1) who were rejected because of alleged lack of intelligence and qualifications under the statute; (2) who were accepted, and who participated in the verdict, and are claimed to have been biased and disqualified; (3) who were accepted, though claimed to have been biased and disqualified, and whom the defendant was compelled to challenge peremptorily.

We cannot say that there was any error made by the learned trial court in rejecting the first class of jurors, upon the ground of lack of intelligence required by section 1079, Code Civ. Proc. That section provides that, in order to be qualified to serve as a trial juror in the city of New York, a person must be intelligent. No particular degree of intelligence is or could be prescribed. It is always desirable that the trial jury in a criminal case should be composed of men of intelligence sufficient to understand and appreciate, and to dispose properly of, the particular case on trial. The grade of intelligence, to comply fairly with this requirement, must necessarily be different in different cases. It could not be the same in all cases. A plain, simple case, involving no complicated questions of fact, and no intricate questions of law, would not call for the same degree of intelligence as a case in which the questions of fact were considerably involved, and the questions of law were difficult to appreciate and understand. Whether, in any case, persons called and examined as jurors are so intelligent as to meet this requirement of the statute must therefore necessarily be determined by the trial court, and must rest in the good judgment and sound discretion of the trial judge. It must be determined, from the evidence given by the jurors themselves, the manner in which they answer the questions put to them, their demeanor while under examination, their appreciation and understanding of the language used in the questions put to them, and their appreciation of the questions of fact and principles of law to which their attention is called. The jurors are in the presence of the trial judge. They are not before the appellate court. And where confidence is reposed in the trial judge, and in his honesty, good judgment, and sound discretion, as it is here, we cannot well say that his decision in rejecting the jurors on the ground of lack of intelligence was erroneous, so as to call for a reversal of the judgment.

The second and third classes of jurors were held to be competent under section 376, Code Cr. Proc. They had formed opinions or impressions with reference to the guilt or innocence of the defendant; but they declared unequivocally that they believed such opinions or impressions would not influence their verdict, and that they could render an impartial verdict on the evidence. The court decided that it was satisfied that they did not entertain such present opinions or impressions as would influence their verdict. This provision of law became necessary by reason of the fact that some modification was needed to be made of the old rule that no person who had formed an opinion and expressed it was qualified to act as a juror. Otherwise, the more intelligent men would be excluded from serving as jurors in important criminal cases, and only the more ignorant men would be allowed to sit in such cases. Daily newspapers, especially in the larger cities, are published in

great numbers. They place before their readers all the details of alleged criminal transactions occurring in the community, and the names of all persons said to be connected therewith, and report all judicial proceedings as to such alleged crimes and criminals. All intelligent men are accustomed to read these newspapers, and may form more or less definite opinions or impressions as to the matters therein contained, and express such opinions or impressions to others. Only the ignorant classes fail to read the newspapers from day to day. It is apparent, therefore, that, when men are called, as jurors, to sit in an important criminal case, a case that has excited great feeling and interest in the community, few honest, intelligent men will be able to say that they have not heard or read of the case, and have not formed or expressed an opinion or impression as to the guilt or innocence of the defendant who is being tried. Men who do say this are discovered to be wanting in intelligence or are suspected of dishonesty in their statements. If, therefore, an honest, intelligent jury is to be obtained at all in the case, men who have heard and read of the case, and who have formed and expressed an opinion or impression as to the guilt or innocence of the defendant, must be selected.

The intention of the legislature in enacting this statute was to enable the parties to select a jury composed of intelligent men, men who read and think, and form opinions and impressions, and express them, rather than one composed of men who are ignorant, who do not read or think, or have ideas with reference to things transpiring in the community. In People v. McGonegal, 136 N. Y. 62, 32 N. E. 616, Maynard, J., said:

"This statute proceeds upon the reasonable theory that the existence of an opinion as to the subject of the investigation is not inconsistent with the attitude of an impartial seeker after truth. It recognizes, what an intelligent observation confirms, that it is safer to trust a man who keeps himself informed as to the current events of the community in which he lives, and has views and opinions of his own with respect to their import, than it is to rely upon the judgment of one who takes no interest in such matters or does not have sufficient intellectual activity or vigor to form an opinion in regard to them when they are brought to his attention."

The legislature, at the same time, surrounded persons charged with crime with adequate safeguards to protect them against biased or prejudiced jurors. One ground of challenge provided for by section 376, Code Cr. Proc., is:

"(2) For the existence of a state of mind on the part of a juror in reference to the case or to either party, which satisfies the court in the exercise of a sound discretion that such juror cannot try the case impartially and without prejudice to the substantial rights of the party challenging. But the previous expression or formation of an opinion or impression in reference to the guilt or innocence of the defendant, or a present opinion or impression in reference thereto, is not a sufficient ground of challenge to any person who is otherwise legally qualified if he declare on oath that he believes that such opinion or impression will not influence his verdict, and he can render an impartial verdict according to the evidence, and the court is satisfied that he does not entertain such a present opinion or impression as would influence his verdict."

It will be seen that a juror must, under oath, declare his belief, as prescribed by the statute, and beyond that the court must be

satisfied.   If satisfied, in the exercise of a sound discretion, that the juror cannot try the case impartially and without prejudice, the challenge must be sustained, under the first part of the subdivision; and, unless satisfied that the juror does not entertain such present opinion or impression as would influence his verdict, the challenge must be sustained under the last part of the subdivision. In People v. McQuade, 110 N. Y. 300, 18 N. E. 156, Andrews, J., said:

"There has been no change in the fundamental rule that an accused person is to be tried by a fair and impartial jury.   Formerly the fact that a juror had formed and expressed an opinion touching the guilt or innocence of a person accused of crime was, in law, a disqualification; and, although he expressed an opinion that he could hear and decide the case upon the evidence produced, this did not render him competent.  *  *  *  Now, as formerly, an existing opinion, by a person called as a juror, of the guilt or innocence of the defendant charged with crime, is, prima facie, a disqualification; but it is not now, as before, a conclusive objection, provided the juror makes the declaration specified, and the court, as judge of the fact, is satisfied that such opinion will not influence his action.   But the declaration must be unequivocal.   It does not satisfy the requirement if the declaration is qualified or conditional. It is not enough to be able to point to detached language which, alone considered, would seem to meet the statute requirement, if, on construing the whole declaration together, it is apparent the juror is not able to express an absolute belief that his opinion will not influence his verdict."

In People v. McGonegal, 136 N. Y. 62, 32 N. E. 616, the jurors had unequivocally declared their belief, as required by the statute, and the court held that the remaining questions as to the qualification of the juror under this statute were questions of fact, and the decision of such questions was not reviewable on appeal, under section 455, Code Cr. Proc.

All the jurors in these two classes unequivocally declared their belief, as required by this statute, and the only questions remaining are whether the trial judge properly decided that he was satisfied that the jurors could try the case, impartially and without prejudice, and that they did not entertain such present opinions or impressions as would influence their verdict.   It is doubtful whether these decisions by the trial judge are reviewable upon appeal, under People v. McGonegal, above; but, if the right of review does exist, we cannot say that the decisions were erroneous. The trial judge acted, not alone upon the evidence given by the jurors themselves, but upon the appearance and demeanor of the jurors, and the intelligence exhibited by them upon their examination.   These are important factors in reaching a just conclusion in all cases.   These aids to a correct judgment are not available upon appeal.   The trial judge had the best means of deciding the qualifications of the jurors, and of judging whether they were honest in declaring their belief, and whether their judgment as to their ability to act in accordance with such belief was to be safely relied upon.   Considering the examination to which the jurors were subjected, as disclosed by the record, and that jurors were not lawyers, but were laymen, and were presumably willing to be relieved from service on the jury, it is not remarkable that they made some answers that were apparently inconsistent with their

belief as finally declared.    This would be likely to occur.    Upon the whole evidence given, and upon the personal appearance and de- meanor of the men while being examined, the learned trial judge made the decisions overruling the challenges; and, even if such decisions are reviewable on appeal, we should not be willing to question their correctness here.    There were more or less excep- tions to evidence taken on the examination of the jurors, but none of them call for any special notice here.    The extent of the exami- nation was largely in the discretion of the trial judge, and we can- not see that such discretion was improperly exercised.    Our con- clusion is that there were no errors with reference to the impanel- ing of the jury calling for a reversal of the judgment.

It is claimed that the fifth count in the indictment under which the trial was had, resulting in the conviction of the defendant, contained no allegations as to the time when and the place where the crime was alleged to have been committed.    We do not regard this claim as well founded.    The allegations of time and place in the other counts of the indictment were so far made a part of the fifth count that it may be said the fifth count did contain such necessary allegations; and the election made by the district attor- ney to proceed alone under the fifth count did not so far take the other counts out of the indictment as to leave no allegation of time and place in the fifth count.    The allegations of time and place in the other counts in the indictment were referred to in the fifth count, and thereby became a part of that count.    It appears, from the record, that, at the opening of this trial, the district at- torney elected to proceed upon the fifth count of the indictment only, and the court permitted the other four counts of the indict- ment to stand only for the purposes of reference.    It was neces- sary that these questions should be settled at the opening of the trial, in order that the parties might understand their rights in reference to peremptory challenges in the selection of the jurors. The indictment as it stood at the time of the last trial was not defective in this respect.

As we have already stated, the threat in this case was claimed to have been made, not by the defendant himself, but by his ward man, Burns.    The prosecution undertook to charge the defendant with responsibility for this threat by showing the existence of a general scheme by which, within the precinct over which the de- fendant was in command, Burns should act as defendant's agent in making threats for the purpose of extortion, and thus to bring the defendant within the provisions of section 29 of the Penal Code, which provides that:

"A person concerned in the commission of a crime, whether he directly does the act constituting the offence, or aids and abets in its commission and whether present or absent, and a person who directly or indirectly counsels, commands or procures another to commit a crime, is a principal."

In this state the law previously existing in cases of felony has been so changed that one who formerly would have been an acces- sory before the fact is now a principal, and a person charged in an indictment with the commission of a felony may be convicted

upon proof that, although absent when the crime was committed, he advised and procured its commission; and it is not necessary to set out in the indictment the facts showing the crime was committed through the agency of another, but a conviction may be had under an indictment charging merely that the defendant himself committed the crime for which the conviction is sought. People v. Bliven, 112 N. Y. 79, 19 N. E. 638; People v. McKane, 143 N. Y. 455–465, 38 N. E. 950.

For the purpose of proving the general scheme claimed to have existed, and the agency of Burns for the defendant in pursuance thereof, and in the commission of this offense, the people were permitted to give evidence of various transactions occurring, before the time of the alleged commission of this crime, during the years 1888, 1889, 1890, and 1891, wherein it was claimed Burns acted as the agent, and under the counsel, command, and procurement, of the defendant, in extorting money from Seagrist and others by means of threats to do unlawful injury to their property. There was a transaction with Seagrist in August, 1888, and another in May, 1889; one with Chesley in February, 1890; and one with Galligan in November, 1891; and there were conversations between Seagrist and the defendant during these years tending to show Burns' agency for the defendant in these transactions. All this evidence was given by the prosecution for the sole purpose of establishing criminal agency, and the learned trial court in its charge explicitly limited the effect to be given to the evidence to this purpose. This evidence was objected to by the defendant on the ground that it was incompetent to prove the commission of other prior offenses by the defendant for the purpose of establishing his guilt of the crime for which he was being tried.

It is undoubtedly true that proof may not be given of the guilt of the defendant of other crimes for the purpose of raising the presumption that he committed the crime for which he is being tried. No inference can be drawn by a jury that one crime has been committed from the fact that the defendant has committed other crimes. But it is not true that proof may never be given of the commission of other crimes than that charged in the indictment upon which the trial is being had. There are many cases in which such proof may be given as bearing upon the motive and the intent and other facts in issue. People v. Sharp, 107 N. Y. 427, 14 N. E. 319; People v. McKane, 143 N. Y. 455, 38 N. E. 950; People v. Shea, 147 N. Y. 78, 41 N. E. 505. In the Shea Case the prosecution was permitted to show that the defendant was engaged in other transactions on the day of the homicide, at different times and places from those when and where the homicide was committed, which were in fact crimes against the elective franchise; and the court of appeals held that such evidence was proper upon the question of premeditation and deliberation, Judge Peckham saying:

"In order to prove the defendant's guilt, it is not permitted to show his former character, or to prove his guilt of other crimes, merely for the purpose of raising a presumption that he who would commit them would be more apt to

commit the crime in question. Evidence, however, which is relevant to the issue, by tending, for example, directly to explain or characterize the act which is in question on a criminal trial, has never been held incompetent, because it also tended to, or did, prove the defendant guilty of another crime. The evidence in question, we think, comes under this latter rule. It was received by the learned trial judge upon the question of the intention and deliberation of the defendant in firing the shot at the deceased. Upon the grounds stated and for the purpose mentioned, we are clear that the evidence as to repeating was admissible, and the exception thereto was without merit."

In the McKane Case, O'Brien, J., said:

"The prosecution attempted to show a criminal conspiracy or scheme in which many officials were engaged for the purpose of casting a large fraudulent vote at the election, and that the concealment of the registry list from the public prior to the election was or became a necessary part of the scheme. The inquiry necessarily took a very wide range. The evidence received could not have been admitted to show that the defendant might have been guilty of some other offense or wrongdoing not charged in the indictment; but, if it had a bearing upon the issue involved in the trial, it could not be excluded merely because it tended to justify such an inference."

The evidence here was not given for the purpose of raising a presumption that the defendant committed this crime because he had before this been guilty of other crimes of a like nature. The prosecution sought to prove such agency of Burns. They could not be expected to do this by direct evidence. They must prove it, if at all, by circumstantial evidence; and this might properly be done by giving any proof that tended to establish such criminal agency, notwithstanding the evidence given also tended to prove other distinct crimes to have been committed by the defendant through the agency of Burns. The only question is whether the evidence received of these prior transactions was competent and proper, as circumstantial evidence tending to establish the fact sought to be proved. The rules of evidence are the same in criminal cases as in civil cases, except as otherwise provided in Code Cr. Proc. § 392. It is common, in civil cases, to establish agency by showing the relations of the parties in other transactions than the one in issue in the case on trial, by showing other transactions relating to the same business, and extending over months and years when the parties held the relations of principal and agent; and we see no reason why the same rule of evidence may not be applied in this case. The suggestions made by the learned trial judge in his charge upon this subject, and explaining the purpose for which this evidence was received, seem to us to have been proper and correct. The evidence given tended to show that these men occupied the same official relations to each other during the years 1888, 1889, 1890, and 1891, prior to the alleged commission of this crime, and that they were engaged in this same general scheme of extortion, Burns acting under the advice, commands, and procurement of the defendant, apparently in pursuance of such general scheme; and that the defendant, in conversations had with him, practically conceded such agency in such prior transactions. We have no doubt but that the evidence of the transactions themselves was competent, in connection with the conversations so testified to, as tending to establish the agency of Burns for the de-

fendant in the commission of the crime for which the defendant was being tried.

There were some exceptions taken to particular items of this class of evidence, and to the instructions of the court to the jury with reference thereto; but we do not regard them as meritorious. We are of opinion that this class of evidence was properly received upon the trial.

It is claimed that the admission of the entry, in Seagrist's books, under date of November 21, 1891, was erroneous. The entry was made by Seagrist in his books on the day he paid the money,—the $50 referred to in the indictment. The entry reads as follows:

"Nov. 21, 1891, material paid to McLaughlin for protection, per Sergt. Burns, ordinance officer, $50."

It appeared, on the trial, that, when Seagrist was before the grand jury, he testified that he paid the $50 to the defendant himself. He had with him, then, a copy of an entry in his book, made for him by a young man in his employ. This copy was put in evidence, but was subsequently stricken out, and was not before the jury. After the indictment was found, and before the trials were had, and in April, 1895, Seagrist examined the entry in the book itself; and then he testified on the last trial that he could not remember whether he paid the money to the defendant or to Burns. He recollected that he paid to the one or the other, but he could not remember which. He said, also, that he could only state the date of the payment by looking at the entry in the book. He testified that he made the entry at the time, in the regular course of business, and that it correctly stated the facts therein contained, and the date as well. The entry was offered in evidence by the prosecution, and the defendant objected to it as incompetent and inadmissible for the purpose of showing to whom the money was paid, or for any other purpose, and that the witness could not, by writing in his own books at a particular time, make the statements therein contained written evidence against the defendant for any purpose. The court received the entry in evidence, stating the rule to be that:

"A witness may examine a memorandum or entry made by himself at the time of the occurrence for the purpose of refreshing his recollection. If it does not refresh his recollection, if his recollection is not clarified by the entry, but he states that he made the entry or memorandum at the time, and made it truly, and made it in his own handwriting, then the memorandum is bodily admissible as evidence in chief."

The whole entry was read to the jury. The learned trial judge, in his charge to the jury, commented upon this entry, and its effect as evidence, as follows:

"Now, on the question of payment of the money, Seagrist says, in this particular instance, that he paid the $50 to one or the other, to Burns or to the defendant. He also tells us that, when he was before the grand jury, he testified that he paid it to the defendant personally, and that he then believed that testimony to be true. He adds, however, that subsequently, upon looking at his book, he found the entry therein in his own handwriting, on the very day of the payment, and that this entry caused him to hesitate in giving effect to the expression of his recollection. In other words, he said, in sub-

stance, 'I recollected, when I testified before the grand jury, what I then testified to; but I am unwilling now, in view of that entry, positively to swear that the money was paid personally to the defendant, and I give the defendant the benefit ·of the doubt created by the entry.' * * * If the criminal concert of action between these parties is made out, then, whether Seagrist's recollection as to the payment to the defendant personally is at fault, or not, makes no difference. If he paid it to the defendant personally, the fact is there. If he did not pay it to the defendant personally, but paid it to Burns, then, if the criminal concert is made out, the law says the payment to Burns was the payment to the defendant. * * * It is for you to say, however, whether the expression of doubt thus caused does or does not tend to show that the witness was conscientious; for, after all, gentlemen, the entry had not refreshed his recollection, as he admits, but rather clouded it. However, the entry was admitted as independent evidence, and it is before you as such. I therefore leave it to you to say whether an entry made in a man's books, at the time, in the manner, and under the circumstances that this was made, is or is not more satisfactory than human recollection. I leave that to you. The entry was not a memorandum made upon a slip of paper, or in a diary, but was carefully made in the witness' books of account. Entries precede and entries follow it. It is for you to say whether such an entry does or does not carry greater conviction than human memory, whether it was likely to have been fabricated, whether there is anything in the surroundings to justify the conclusion that, on the 21st of November, 1891, it was falsely entered for an ulterior purpose. Is there anything to justify such a conclusion? I leave that to you to say. It is there before you as evidence. You have the threat testified to by Seagrist. You have the entry. It is for you to say what the value of that testimony is on this issue. As far as the entry in the book is concerned, I leave it to you to say whether there is any evidence in the case, assuming it to be absolutely true, which conflicts with what is stamped upon the page of that book. * * * It is for you to say whether the testimony as to the declarations made by Seagrist out of court really militates against the testimony he gave here. Again, does it militate against the entry in the book?"

At the close of the charge, the defendant, among other things, said:

"I also except to each and every part of the instructions as to the question of payment of money. * * * I want to except to that part of the charge in which you instruct the jury as to the entries in Seagrist's book, and as to how it affected Seagrist; also, ·to each and every statement in the charge, separately, respecting Seagrist's testimony on that point. * * * I also except to that part of the charge in which you state, in substance, that the entry in Seagrist's book is evidence, and in which you leave it to the jury to say whether the entry in Seagrist's book is not more satisfactory than human recollection, and to each and every instruction about such entry, and in regard to the entry being evidence for any purpose."

We have thus given a very full statement of the facts relating to this entry, its offer, and its reception in evidence, the objections made to it, and the instructions by the court to the jury with reference thereto. The rule of law was correctly stated by the learned trial judge in his decision admitting the entry in evidence. Under this rule, we are entirely satisfied it was competent evidence in the case as to the date when the money was paid and the person to whom it was paid. It cannot be denied that it was material to show the date and the particular person to whom the money was paid. Neither of these facts could be remembered by the witness after looking at the entry. The entry was evidence tending to show that the date was November 21, 1891, and that the person to whom the money was paid was Burns. There seems to be no real doubt as to what the entry means, to wit, that the money was

paid to the defendant through or by the hand of Burns. The prosecution was not precluded, by the doubt expressed by Seagrist as to the meaning of the entry, from having the entry itself in the case and before the jury. He was evidently willing to be in doubt, for the benefit of the defendant, to aid him in his defense. But the prosecution was under no obligation to sympathize with him in that regard. Its duty was to prove the defendant's guilt if it could, and it had the legal right to give any competent evidence it could on that subject. This entry was strong evidence that the money was paid to Burns, and it was received in evidence solely for that purpose, and to prove the time when the money was so paid. For this purpose it was, as stated by the learned trial judge, independent evidence, and was properly received as such. The only answer to this position is that the fact as to whom the money was paid was immaterial in the case as it was tried. We do not so regard it. The witness stated that he paid the money to one or the other of these two men. Was it not competent and material to ask him which man it was to whom he paid it? Could an objection to that question to him have been properly made? Certainly not. And if this be true, then the witness, being unable to recollect, after examining the entry, which person he paid it to, the entry itself was competent evidence as tending to prove that fact.

It is said, however, that a conviction could be had, as the case stood, only upon the theory of a payment to Burns, because Seagrist having failed to testify that it was paid to the defendant personally, being unable to remember that fact, there was no evidence upon which a payment directly to him could be found. The prosecution must, therefore, rest the case upon proof of a payment to Burns, and to him alone. That is true. The defendant had asked Seagrist if he remembered that he paid the money to Burns, and if he would swear to it; and he replied, "No; he could not swear to it, because he did not remember that he did." In this condition of the evidence, it is beyond question that it was material and necessary that proof should be given as to the person to whom it was paid, and that Burns was such person. The entry stated this fact. Seagrist did not and could not remember this fact after examining the entry. The entry itself was, therefore, clearly competent, as tending to prove this fact. The prosecution had no other way of proving it, in view of the want of memory of Seagrist. It was peculiarly a matter of necessity to have this evidence, within all the authorities permitting this class of evidence to be given.

It is said, however, that the entry contained other matters which were prejudicial to the defendant, that the fact was stated that the payment was "for protection," and that there was a criminal agency; Burns receiving the money for the defendant for such protection. No such question as this was raised, or in any way suggested on the trial. It has evidently occurred to the defense since the trial was closed. The purpose for which the prosecution offered the entry was to fix the date and the person to whom the money was paid. If there had been any suggestion on the part of

the defense that portions of the entry were objectionable, the court could have provided that only such portions of it as were proper should be read or submitted to the jury, and the balance could have been withheld from them. Nor was the learned trial justice requested in any way to protect the defendant by instructing the jury as to the particular use that should be made of the entry as evidence, and that they should regard it for no other purpose. The defendant contented himself with an exception to each and every thing the trial judge did say on the subject. What he did say was correct. He would undoubtedly have given further instructions if the defendant had requested them. He called the attention of the jury to the entry as evidence of the fact as to whom the money was paid, and to its effect in that regard, suggesting that the entry might be stronger evidence than even Seagrist's positive recollection of the fact. We should not now, on appeal, reverse this judgment, because there were some other facts stated in the entry than those sought to be proved, and the charge did not explicitly limit the effect to be given to the entry as evidence, when no such question was raised on the trial, and, if raised, could have been obviated in the manner we have suggested. We think no error was committed in the reception of this entry in evidence.

During the examination of Seagrist as a witness, it appeared that, while before the grand jury, he had a copy of a portion of the entry we have just considered, the part reading: "November 21, 1891, material paid to McLaughlin, $50." On the trial, Seagrist said, at first, that he had a copy of the entry in his books, without stating what it was; and yet he testified before the grand jury that he paid the money to the defendant personally. In order to avoid the inference that might be drawn that he had a copy of the full entry referring to Burns at the time he testified before the grand jury, the prosecution asked the defense to concede that it was not a full copy of the entry, and that it had in it no reference to Burns; that they did not desire any concession as to what it did contain, but simply as to what it did not contain. The defense refused to make any concessions, and the prosecution then offered in evidence the paper itself, for the sole purpose of avoiding any inference that Seagrist had a copy of the whole entry when he testified, before the grand jury, that he paid the money to the defendant personally. The court at first received the paper in evidence, and a little later struck it out, and instructed the jury to disregard it. There may well be doubt as to whether the first ruling of the learned trial judge admitting the paper in evidence was erroneous, under the circumstances. But, even if it was, we think the error was cured, so that no injury could have resulted to the defendant from the admission of the paper in evidence, and thereafter striking it out. In Lindsay v. People, 67 Barb. 548, affirmed 63 N. Y. 143, evidence was received, and afterwards stricken out, and the jury were instructed to disregard it. The general term held that the evidence was taken out of the case, and the exception with it. The case was affirmed by the general term and by the court of appeals, and the defendant was executed. Certainly, no injury could have resulted

in this case to the defendant, because the full entry, of which this was a part, was properly received in evidence, and considered by the jury.

It is claimed that the defendant was improperly convicted, under the evidence, of the crime of extortion; that, if guilty of any crime, it was the crime of bribery; and that the trial court improperly instructed the jury upon this subject. The main evidence as to threats was given by Seagrist. He testified that, at the time of the talk with Burns, the work of tearing down the building had been commenced, the floors had been open, the cornices and roof had been taken off, and some material had been taken out of the building, and that he understood that the work had been stopped for half a day, that Burns had stopped the carrying of any materials across the sidewalk, and putting them upon trucks, or piling them upon the sidewalk. Connelly had charge of the work for Seagrist. The same day, and before Seagrist and Burns had their talk, Burns had an interview with Connelly. Connelly had put a blockade across the sidewalk of barrels and boards, to keep people off the sidewalk under the cornice, which was being torn off the building. Burns told Connelly he could not have these barriers up, that he (Connelly) had good cheek to put them up; and he (Burns) kicked them down. Burns asked Connelly if he had a permit. Connelly said he had, and showed it to Burns. Burns said it didn't cover blocking the sidewalk, and asked where his (Connelly's) boss was; said his boss ought to be there, and attend to it. Burns told Connelly he would have him arrested if he blocked the sidewalk, and that he (Burns) would have to see Seagrist. Seagrist then went to the building, and had a talk with Burns. Burns said that Seagrist should not go ahead with the work until he had been down to the captain's office. Seagrist said he would go down; and he went, but did not find the defendant in. The next morning he went to the building again, taking the money ($50) with him, and paid the money that day, and then proceeded with the work, and no complaint was made after that by the defendant or Burns. In the charge to the jury, the learned trial judge said:

"The prosecution has to prove the threat. It is of minor consequence what was actually done. The question is not whether the threat was executed,—whether, for instance, the boards that were placed upon the barrels, to prevent people from being injured as they passed, were actually kicked down or not. Of course, such acts might aggravate the threat, and prove that it was seriously intended; but what the law requires is the threat itself, not, necessarily, the execution of it. And that view of the matter renders the testimony of Connelly really somewhat unimportant against the main question as to whether there was a threat. He testified that certain acts were done. The main question is, was there a threat to do an unlawful injury to Seagrist's property? As to that, Mr. Seagrist gives evidence in this language, speaking of the interview he had with Burns (I am speaking now entirely of the threat charged in the indictment): 'He [Burns] said I must come down and see the captain, and not go ahead with the work until I had. Q. What did he say about not going ahead? A. That I should not go ahead with the work. Q. Until what? A. Until I had been down to the captain's office.' Nothing there, gentlemen, about corporation ordinances. If that testimony is true, the threat was that Seagrist should not do any work at all until he had

seen the captain. Now, if you believe that testimony, it is a sufficient threat, in law, of injury to property. To threaten a man that he will not be permitted to pursue his lawful avocation at all unless he goes somewhere where he is not bound to go, or does something which he is not bound to do, is a threat of unlawful injury to property. It is immaterial whether the threat was executed. If the threat was made, and the money was paid under the apprehension that, if it was not paid, the threat would be carried out, the offense is complete. The only fear which the law requires is fear that, unless the party attacked submits to the demand of the person attacking him, his business will be injured. A threat to injure his business constitutes the threat contemplated by the law. The fear resulting therefrom is not bodily fear. It is an apprehension of injury to property rights. And the stoppage of a man's business is an injury to property and property rights. * * * You have the threat testified to by Seagrist. * * * Now, is there any contradiction of this testimony, so far as the threats are concerned? There is none; none whatever."

The defendant excepted to these portions of the charge generally, and requested the court to charge that the tearing down of the building in question was not lawful without a permit in writing from the department of public works, and that there was no competent evidence in the case that Seagrist had any such permit as to this building. The court so charged, adding: "It is immaterial, though." The defendant then excepted generally, without specifying that his exception was to the latter remark by the learned trial judge. The court had already charged the jury that, if there was only a threat to enforce the laws and ordinances, in case he violated any of them while taking down the building, or if the fear of Seagrist was that the defendant would enforce such laws and ordinances, the defendant could not be convicted; that the enforcement of such laws and ordinances against Seagrist could not be an unlawful injury to his property, though it interfered with his work; that the receipt of the money by defendant as a consideration for not enforcing such laws and ordinances could not justify the conviction of the defendant for extortion; and if what the defendant did was as captain of the police, and under pretense or color of official authority, he could not be convicted. It is true that a threat by the defendant to do a lawful act as captain of the police force, unless money was paid to him, would not constitute extortion. The failure to perform a legal duty, in consideration of the receipt of money, would be bribery. Under the ordinances of the city of New York, it was the duty of the defendant, as captain of police, and of the men under him, to keep Seagrist and his men from obstructing the sidewalks or streets, unless he had a written permit from the proper department to do so. It did not appear in the case that Seagrist had no such written permit, or that, in tearing down the building, he was, as matter of fact, engaged in any unlawful business. There was no proof that Burns required him to discontinue tearing down the building for any such reason. The case was submitted to the jury upon the question of the threat, as testified to by Seagrist, that he must not proceed with the work at all until he had seen the captain; and it appears that, when he had seen the captain, he was permitted to proceed, and finish the work without further interference from Burns or the defendant,

though his workmen were engaged in such work for something like 16 days. The court, in substance, charged the jury that, if the threat was made as Seagrist testified to, it was a sufficient threat under the statute as to extortion. If such threat was not made, no conviction of the defendant could be had at all. In Burns' statement, there was no suggestion as to Seagrist's work being unlawful, as to the absence of any permit, or as to the performance of their duty as policemen by himself and the defendant in preventing the obstruction of the street or sidewalk. The broad, unequivocal statement was made that the whole work must stop, not until he had secured a permit, but until he had done what he was under no obligation to do,—gone down and seen the captain. The import of this language, certainly, in view of Seagrist's former experiences and transactions with Burns and the defendant, was very clear, and very easily understood. Seagrist well knew what it meant. He obeyed the directions, and that ended all his troubles. He was permitted, without molestation, to proceed with and finish his work. It seems to us, under the charge of the learned judge, the crime was clearly extortion, and not bribery, and that there was no error committed by the court in submitting this issue as to the alleged threat to the jury.

Very many other exceptions appear in the record, which is quite voluminous, and which we have examined and considered, but which we do not deem it necessary to refer to in detail here. They are not of sufficient merit to require a reversal of the judgment. It seems to us that the defendant was proven, beyond any reasonable doubt, to have been guilty of the crime of extortion charged in the indictment, and that the judgment should be affirmed. All concur.