KLUCK, Plaintiff in error, vs. THE STATE, Defendant in error.

*October 16, 1936—January 12, 1937.*

For the plaintiff in error there was a brief by *Martens & Meleski* of Stevens Point and *Bird, Smith, Okoneski & Puchner* of Wausau, attorneys, and *Charles F. Smith* of Wausau of counsel, and oral argument by *Mr. Smith*.

For the defendant in error there was a brief by the *Attorney General, J. E. Messerschmidt*, assistant attorney general, and *R. B. Graves* of Wisconsin Rapids, district attorney *pro tem.*, and oral argument by *Mr. Graves*.

The following opinion was filed November 10, 1936:

FRITZ, J. The first assignment of error is that the trial court erred in denying defendant's plea in abatement, on the ground that he had been bound over to the circuit court without sufficient evidence. It is well established that in passing upon such a plea, the reviewing court is required to,—

"Examine the evidence only sufficiently to discover whether there was any substantial ground for the exercise of judgment by the committing magistrate. It cannot go beyond that and weigh the evidence. It can say whether the complaint will admit of a construction charging a criminal offense, or whether the evidence rendered the charge against the prisoner within reasonable probabilities. That is all. When it has discovered that there was competent evidence for the judicial mind of the examining magistrate to act upon in determining the existence of the essential facts, it has reached the limit of its jurisdiction on that point. If the examining magistrate acts without evidence, he exceeds his jurisdiction; but *any act, upon evidence worthy of consideration in any aspect,* is as well *within his jurisdiction* when he

decides wrong as when he decides right." *State ex rel. Durner v. Huegin,* 110 Wis. 189, 237, 85 N. W. 1046; *State v. Whatley,* 210 Wis. 157, 159, 245 N. W. 93.

The record in this action discloses that the evidence warranted the examining magistrate in concluding that the charge made against Dan Kluck was within reasonable probabilities because there was credible evidence which established or fairly admitted of inferences to the following effect:

On, and for several years prior to, September 6, 1935, Dan Kluck was the proprietor of the Empire Tavern in Stevens Point. On the night of that day a still, then in use for the manufacture of illicit alcohol on a farm near Stevens Point, was raided and seized by John W. Roach, chief inspector for the state treasury beverage tax division department, with the aid of twelve deputies. They proceeded by a private and the public roads to John Krupka's farm, and en route arrested several other men and confiscated cars engaged in transporting that alcohol. In a garage at the Krupka farm the officials found and seized one hundred sacks of sugar, large quantities of bottles, made in imitation of those used in lawfully selling "Seagram Seven Crown" liquor, and also one thousand fibre-board cartons with partitions to accommodate the counterfeit bottles. While those seizures were being made, John Bannach, who was subsequently arrested as a codefendant herein, and who was largely in charge of the manufacture and sale of the illicit liquor in question, requested, at Stevens Point, Glenn Scheider, who had been hired by Bannach to aid in handling the illicit alcohol and was also arrested subsequently, to accompany him in an automobile, in which they,— accompanied by Phil Kluck, a brother of Dan Kluck,— drove past the Krupka farm, where they saw the lights of two or three automobiles, and then turned around and, after again passing that farm without stopping, returned to Stevens Point. There, at about midnight, Bannach and Phil

Kluck, after leaving Scheider at a hotel, went to Dan Kluck's Empire Tavern and Bannach reported to Dan Kluck his suspicion that the Krupka storage place was being hijacked again. However, even before Bannach made that report, Dan Kluck had received a report to the same effect by telephone at his tavern, while Ed. Zinda and Leo Frymark, the chief of police of Stevens Point, were there with him. After making his report, Bannach picked up Scheider and also the sheriff to go with them to the Krupka farm on the theory that there was another hijacking there. Bannach had a sawed-off shotgun, and the sheriff took a high-powered machine gun along. Dan Kluck drove in his automobile, accompanied by Frymark and Zinda, to the Krupka farm, and upon arriving there they were promptly arrested. When Bannach arrived at the farm and saw a crowd and what was going on there, he did not stop excepting to let off the sheriff, whom he told that if there were state officers, it was all right, but if there were hijackers to light into them, or words to that effect.. When the sheriff approached the garage he was also arrested.

While Roach was taking Dan Kluck back to Stevens Point in a car, Roach asked him how he happened to get out there and to that particular farm. He replied he heard there was a stick-up and went out to see what was going on. He did not know how he happened to go to that farm, but he drove without stopping at any other place on the way out, and as he saw the cars in the yard they drove in. Upon Roach's trying to get the reason for Dan Kluck's driving directly to that farm without stopping at any other places, he told him that they had gotten a telephone call at his tavern about a stick-up, and when he was then asked how telephone calls in relation to stick-ups happened, at that hour of the morning, to go to the Empire Tavern, he replied that he didn't know,— somebody just called. When Roach asked, "How long has

this still been going, Dan," he said he didn't know anything about it, but added, "No man in Stevens Point is rich enough to own that still."

Furthermore, there was proof that Bannach's headquarters were in the Empire Tavern; and that in a private room there he gave directions to Glenn Scheider. After the latter's arrest, his father, Rudolph Scheider, while walking to the Empire Tavern with Dan Kluck, told the latter that it was a nice thing for Glenn to "get roped into it," and not get any help; that Glenn was out of work and out of money and his car bill was to be paid. Dan Kluck replied, "We'll see that he eats;" and (in respect to the car bill) "I will see that it gets paid." After that Rudolph Scheider was given $50 in cash in the Empire Tavern by Dan Kluck's bartender.

Those facts and circumstances warranted the belief that the peculiar and extraordinary interest on the part of Dan Kluck, in respect to the suspected hijacking on that night, was because he was financially interested and participated in conducting that illicit liquor business. That was convincingly indicated by such circumstances as that Bannach, who was directly in charge of that business used Dan Kluck's tavern as his headquarters, and there gave directions to employees; that, although it was then midnight, Bannach, upon discovering the assumed hijacking, promptly reported to Dan Kluck at his tavern, and that he had already received a similar report, and then drove directly to the Krupke farm accompanied by Zinda and the chief of police; that Dan Kluck apparently knew of the magnitude of the still, etc., when he told Roach that no man in Stevens Point was rich enough to own it; and Dan Kluck's promise to Rudolph Scheider to aid his son financially, and the payment of $50 to him by Dan Kluck's bartender without any other explanation for that payment, were made because Dan Kluck considered himself under some obligation to Glenn Scheider, which could be accounted for only upon the theory that he was implicated in the crime for which Scheider and the others had been

arrested. As those matters collectively justified the magistrate in binding Dan Kluck over to the circuit court for trial, that court rightly overruled the plea in abatement.

The second assignment of error is that the court erred in denying Dan Kluck's timely motion for a separate trial. He claims that by trying him jointly with twelve defendants he was wrongly prejudiced by the receipt in evidence of confessions made by some of them; by the conclusive proof of the participation of some of them in operating the still and transporting alcohol and sugar to and from the still; by evidence of some of them as to meeting Bannach in Dan Kluck's tavern; by his being obliged to sit during the trial with the other defendants and stand up at times for identification; and by the confused mass of testimony which involved a number of defendants but only a meager portion of which involved him at all, and did not show any direct connection between him and the still. He also claims that his defense was antagonistic to that of Bannach and others who admitted that they did business in connection with this still on a few occasions in his place of business. A review of the record, however, discloses that there is nothing therein to establish that any confusion occurred which affected the jurors; that Dan Kluck's defense differed entirely from that of all others in that he denied having any knowledge of or connection with the operation of the still or sale of its product; that none of the defendants in their confessions or testimony implicated him; and that the defense of Bannach and the others was not antagonistic to his, either because of their admissions that they did business in relation to the still on some occasions in his place of business, or for any other reason. Their admissions were obviously not made to implicate him. As there is nothing in the record showing any abuse of discretion on the part of the trial court in denying the motion for a separate trial, that ruling must be sustained. As was said in *Smith v. State*, 195 Wis. 555, 558, 218 N. W. 822: "The granting or refusal of a separate trial of defendants in a

criminal case rests largely in the discretion of the court, where the offenses arise out of the same transaction. Joint trials ordinarily facilitate the speedy administration of justice, and on an application for separate trials the issue presented to the court and which it is called upon to determine consists of the question whether justice will be done by granting the motion."

The third assignment of error is that the verdict of guilty is not supported by the evidence. On the trial, in addition to the facts and circumstances established or inferable, as stated above, from evidence to the same effect as that introduced on the preliminary examination, there was evidence to the following effect: Bannach was working for Dan Kluck and was at his tavern day and night. The paper cartons for packing counterfeit liquor bottles, found on the Krupka farm, were part of a shipment manufactured and delivered by the Ahdawagam Paper Products Company on an order placed with it in the name of Dan Kluck by a personal messenger. An acknowledgment of that order was made in a letter addressed and mailed to Dan Kluck on July 10, 1935, to which he did not reply. Although he denies receiving that letter, the cartons were duly accepted and paid for upon delivery. On one occasion, either in June, July, or August 1935, Glenn Scheider loaded two Ford cars with alcohol taken from the basement of Dan Kluck's residence in Stevens Point. Just before daylight, on a day in the latter part of August, 1935, Dan Kluck drove in an automobile with Glenn Scheider, Bud Haupt, and a brother of Dan, to a certain road, where he stopped and awaited the arrival of a truck driven by Earl Blink and loaded with alcohol. When it arrived, Scheider was given charge of it, and Dan and his other companions and Blink drove back to Stevens Point. Although those acts connecting Dan Kluck with the transportation of alcohol did not occur on September 6, 1935, the evidence thereof was competent because it tended to prove that the manufacture and traffic in the illicit alcohol was a continuing offense which

was in full swing in the summer of 1935. Furthermore, because that evidence was within the exception recognized in *Paulson v. State*, 118 Wis. 89, 94 N. W. 771, that, where other criminal acts are so connected with the offense charged that their commission directly tends to prove some element of the latter, such as guilty knowledge, or some specific intent, evidence of such other acts is admissible to explain or to corroborate the evidence showing the act charged. (16 C. J. p. 592, § 1141; *People v. Bidleman*, 104 Cal. 608, 38 Pac. 502; *Toll v. State*, 40 Fla. 169, 23 So. 942; *Townsend v. State*, 147 Ind. 624, 47 N. E. 19, 37 L. R. A. 294; *People v. McLaughlin*, 2 App. Div. 419, 37 N. Y. Supp. 1005; *Creech v. State*, 70 Tex. Cr. Rep. 229, 158 S. W. 277.) If it was proven that Dan Kluck participated in or aided and abetted such a crime within a reasonable time prior to September 6, 1935, that was sufficient to sustain the verdict of guilty in this action. (1 Wharton, Crim. Ev. (10th ed.), § 103; *Hawkins v. State*, 205 Wis. 620, 238 N. W. 511; *Benedict v. State*, 190 Wis. 266, 208 N. W. 934.) In view of those facts and circumstances, considered in connection with those established or fairly inferable from evidence substantially like that which was introduced on the preliminary examination, as stated above, it was within the jury's province to find Dan Kluck guilty beyond a reasonable doubt, and the trial court's approval of that verdict must be affirmed.

The plaintiff in error also contends that the court erred in admitting, without sufficient proof as to mailing, the letter written on July 10, 1935, by the Ahdawagam Paper Products Company to Dan Kluck, in which it acknowledged receipt of the order placed in his name for the cartons. He denied receiving the letter, and his counsel objected thereto on the ground that there was no proof that it was ever mailed, in compliance with the rule stated in *Federal Asbestos Co. v. Zimmermann*, 171 Wis. 594, 177 N. W. 881. In that case this court said that proof of the "mere dictation or writing of the letter, coupled with evidence of an office custom with

reference to the mailing of letters, is not sufficient to constitute proof of the mailing of such letter, in the absence of some proof or corroborating circumstance that the letter was at least placed where, in the ordinary course of business, it would be taken to the post office." In that connection the court quoted with approval the rule that,—

"Proof of custom in the sender's office whereby letters deposited in a particular place are taken by an employee and mailed by him, in connection with proof that the letter was so deposited and probably taken and mailed as usual, may support a presumption of due receipt." 16 Cyc. 1068, n. 50.

Those requirements were fully satisfied herein by proof to the following effect: The stenographer, who typed the letter, inclosed it, after it was signed, in an envelope addressed to "Mr. Dan Kluck, Stevens Point, Wis.," and then placed it in a basket in the office where the outgoing mail was always deposited, and where it would in the ordinary course of the business in that office be duly stamped and taken to the post office and mailed as usual. She knew that the letter, with the other letters, was taken from that basket at the usual time for taking the mail to the post office. Another employee, who took all mail to the post office, took all the letters in the mail basket on July 10th and, in accordance with his custom, went over the mail to see that it was properly stamped and that no envelopes were stuck together, and then deposited them in the post office in the city of Wisconsin Rapids.

Plaintiff in error further contends that the court erred in admitting the confessions of other defendants over Kluck's objections. That contention cannot be sustained. It does not appear that those confessions implicated Kluck. In that material respect the facts herein differ from the facts in *Flamme v. State,* 171 Wis. 501, 177 N. W. 596, and therefore that case is not in point. Furthermore, the court properly undertook to avoid any prejudicial consequences to the plaintiff in error by charging that "the jury are instructed

now to observe that all the way through this trial any statement made by any of the defendants after the seizure of that still is evidence only against the person making it."

Error is also assigned because the court admitted in evidence Dan Kluck's 1934 income tax report, in which he reported total receipts of $105,833.60 in 1934, from his wholesale liquor business. He contends that his sales and business in 1934 cannot be proven to show the commission of a crime in 1935. The record discloses that that report was admitted during his cross-examination. Prior thereto he had testified, on his direct examination, that he did not run any other business in connection with his tavern business, and, on his cross-examination, he had testified at first that in the past he had engaged in the saloon and potato business. Then, in answer to the questions, "Have you ever had any other business than those that you have referred to in answer to my questions," and also, "Ever been engaged in the wholesale business," Dan Kluck answered, "No, sir." However, upon being confronted with a certified copy of his 1934 income tax report, he admitted in answer to questions,—which were not objected to,—that, as he stated in that report, he had a loss of $2,886.06 in his retail liquor business, and total receipts of $105,833.60 from his wholesale beverage business. It was not until after that proof was in that his counsel said, "We object to any further questions along this line. We did not want to stop it until now. We think further questioning along this line is going into another issue entirely." Thereupon the court admitted the 1934 income tax report to which reference had been made in the preceding cross-examination, but excluded the report for his 1933 income. In as much as Dan Kluck had testified on his direct examination that he did not run any other business than his tavern, and had admitted in answer to questions which referred to his 1934 income tax report, and which were not objected to, that he had engaged in the wholesale liquor business in 1934, and from that busi-

ness had total receipts of $105,833.60, it was not prejudicial to receive in evidence that 1934 report, which showed merely the facts orally admitted by him before any objection was interposed. Furthermore, in that respect the 1934 report, as well as his final testimony on cross-examination admitting those facts in contradiction of his previous testimony, was admissible because it proved that he had testified falsely in previously stating that he had engaged only in the tavern and potato business.

Error is further assigned because the court overruled objections to questions, in answer to which Rudolph Scheider testified as to the conversation between him and the bartender in charge of Dan Kluck's tavern, when the witness was given the $50 on the day after Dan Kluck had told him, in response to the latter's statement that his son was out of money, and that his car bill was to be paid, "We'll see that he eats;" and "I'll see that it gets paid." In that conversation, as testified to by Rudolph Scheider, Dan Kluck's name was neither mentioned nor referred to, and there was nothing said which in any way further implicated him than was done by the facts which had been duly proven, that those $50 were turned over to Rudolph Scheider without any explanation at the bar of the tavern by the bartender in charge. Consequently, as Rudolph Scheider's testimony as to what was then said added nothing in substance to the facts as otherwise proven, it does not seem probable that the admission of merely that testimony (even if it should be considered otherwise incompetent) as to that conversation constituted error which was prejudicial to the plaintiff in error.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied, without costs, on January 12, 1937.