STATE, Respondent, vs. HENGER, Appellant.

*January 10—February 4, 1936.*

For the appellant there was a brief by *Kersten & McKinnon* of Milwaukee, and oral argument by *Charles J. Kersten*.

For the respondent there was a brief by the *Attorney General, J. E. Messerschmidt,* assistant attorney general, and *William A. Zabel,* district attorney of Milwaukee county, and *Herman A. Mosher,* deputy district attorney, and oral argument by *Mr. Mosher*.

NELSON, J.   The information in this action charged that on November 23, 1932, at the county of Milwaukee, Russell

Beckman, John Henger, and Michael Dolezar, did, with malice aforethought, kill and murder one James Healy. A few days before the commencement of the trial the defendant petitioned the court for a separate trial. The court denied that request. Trial was thereafter had to the court and a jury. Before the case was given to the jury the defendant duly requested that the court submit separate verdicts so that the jury might separately pass upon his guilt or innocence and the degree of his guilt. That request was also denied. The jury returned a verdict finding the defendants, John Henger, Russell Beckman, and Michael Dolezar guilty of murder in the first degree as charged in the information.

Before discussing the several errors assigned, the facts will be stated. There exists in the record no serious dispute as to the material facts. Early in the evening of November 23, 1932, Russell Beckman, Michael Dolezar, and the defendant, all residents of Milwaukee and aged 18, 20, and 19, respectively, left the vicinity of one of their homes in a Chrysler coupé which they had stolen four days before. They concededly started out with the definite intention of holding up filling stations and taverns. They had in their possession a loaded, 38-caliber, revolver which they intended to use in their contemplated holdups, but which, according to their testimony, was not to be fired or discharged. They had read in the newspapers of various successful holdups and thought that they too might get away with such crimes and obtain money in that manner. The defendant, during the early evening, was the driver of the car. Dolezar had the possession of the revolver. They first drove to Fussville, where they held up a filling station, obtaining from the attendant in charge about $3. That holdup was accomplished by Dolezar and Beckman, the former covering the attendant with the revolver while the latter opened the cash register and also searched him. The defendant filled the tank of the automobile with gasoline while the robbery was going on. They

made a successful getaway and then proceeded to Cedarburg, where they bought two pints of whiskey. Later on they held up a tavern and obtained some cigarettes and a little more than a dollar in cash. They looked over several other places but decided that the conditions there were not favorable for a holdup. After purchasing the liquor they partook of it from time to time, and during the course of the evening consumed all of the liquor except about half a pint. The defendant, who was driving the car, became somewhat intoxicated. His driving was criticized by Beckman as being too fast and reckless. Beckman suggested that the defendant should let one of the others drive and that he should get into the back seat. The defendant thereupon got into the back seat and one of the others drove the car toward Milwaukee. Considerable time was spent in just riding around. Shortly after 11 o'clock, as they were proceeding along the Teutonia road they passed a filling station, located at the intersection of Teutonia avenue and Hampton road, which was in charge of the deceased, James Healy. As they passed that station the defendant urged his two companions to hold it up, as he was familiar with it, and knew that it was in charge of an old man who would not resist a robbery. At that time a car was taking gasoline at the station and a motorcycle was standing out in front of it. After proceeding some distance they again turned the driving of the coupé over to the defendant, who turned it around and drove past the station once or twice. It was finally agreed to hold up that station. The automobile was driven into the station driveway and Beckman and Dolezar got out of the car, leaving the defendant at the wheel. Beckman and Dolezar proceeded into the station and entered the toilet. When they emerged therefrom the attendant Healy was seated at his desk at one end of the filling-station room which was about nine feet by fifteen feet in size. Dolezar told Healy that it was a holdup and pointed the revolver at him. Healy immediately arose from

his chair, grappled with Dolezar, and reached for his own gun which he carried in his right hip pocket. Healy was a large and powerful man who weighed over three hundred pounds, and although he was sixty-nine years of age, was quite active. Healy grabbed Dolezar by the throat with his left hand. Dolezar thereupon either passed the revolver to Beckman or Beckman took it from him. Beckman shouted to Healy to let Dolezar go and when (according to his story) he saw the butt of Healy's gun coming from his pocket he fired at Healy's left arm striking it on its outer side about three and one-half inches below the outer tip of the shoulder. Almost immediately after firing the first shot Beckman was pushed out through the station door by Healy and Dolezar while grappling with each other. According to Beckman, Healy was getting the better of Dolezar, and Beckman fired again through the door, but the ball apparently ricocheted off the wooden edge of the door and did not hit Healy. The door apparently was then partly closed, and Beckman, who was standing on the outside saw through the glass that the two were still struggling, and that Healy was still reaching for his gun. Beckman then aimed the revolver at Healy and shot twice. One of the shots hit Healy in the lower left side of his neck and the other in the left breast below the left armpit. Either of the shots just mentioned was sufficient to cause death. Before Beckman fired the two fatal shots the defendant shouted to him to "Come on." Shortly thereafter Dolezar came out and defendant and his companions drove away from the station. They discussed the killing and agreed to "stand pat."

The court, over the objection of the defendant, permitted Beckman to testify that he, Beckman, had participated in a holdup of another place in which the defendant was not involved, and also permitted Beckman, Dolezar, and the defendant to testify regarding another holdup which was par-

ticipated in by the defendant, Beckman, and Dolezar about a week or ten days after Healy was killed.

The defendant first contends that the court erred in denying his petition for a separate trial. No serious contention is made that the defenses of Beckman and Dolezar were materially different from that of the defendant. Certainly they were not antagonistic. The evidence undisputably shows that the defendant and his associates started out on the evening of November 23, 1932, intending to hold up filling stations, taverns, and other places. The defendant knew that Dolezar was armed with a loaded revolver. He himself had contributed to the purchase of the cartridges. During the evening they held up another filling station and a tavern and considered holding up a drug store, but decided that conditions for that holdup were not favorable. The defendant himself urged his associates to hold up the Healy station, knowing that it was in charge of an old man, and believing that the suggested holdup would be an "easy push over." There is no evidence that the defendant had abandoned or desired to abandon the conspiracy to hold up and rob filling stations. While he himself did not enter the Healy station, he was clearly co-operating in the commission of that holdup, although he remained at the wheel of the car so as to make a quick get away after the holdup. We perceive no reason why he should have been granted a separate trial. *Pollack v. State,* 215 Wis. 200, 207, 253 N. W. 560, 254 N. W. 471.

The defendant next contends that the court erred in refusing to submit separate verdicts to the jury. Separate verdicts, it is contended, would have given the jury to understand that it might find the defendant either not guilty or guilty of some degree of homicide less than that of murder in the first degree. It is asserted that there was evidence tending to show that the defendant was somewhat under the influence of liquor, that he and his associates entered into the

conspiracy to hold up filling stations with the understanding or agreement that none of those participating should fire or discharge the revolver, and that he called to Beckman to "Come on" after the first two shots were fired, and that that evidence, if believed by the jury, might lead the jury to conclude that his participation in the crime was less criminal than that of Beckman and Dolezar. It clearly appears from the testimony of Beckman that his motive in shooting Healy was to obtain Dolezar's release from Healy's grip, and to prevent Healy from killing Dolezar and perhaps him and the defendant. The court submitted four forms of verdict covering murder in the first degree, murder in the second degree, murder in the third degree, and not guilty. Each form contained all three names. While we consider it the safer and better practice to submit separate verdicts in criminal actions involving several defendants who are being jointly prosecuted, we are of the opinion that under the undisputed facts of this case the defendant was not prejudiced. He was clearly guilty of whatever offenses his coconspirator Beckman was guilty. There can be no doubt that the jury was justified in finding Beckman guilty of murder in the first degree. As was said in *Pollack v. State, supra* (pp. 211, 212, 214):

"No principle of law is better established than that where several parties conspire or combine together to commit an unlawful act, each is criminally responsible for the acts of his associates committed in the prosecution of a common design, the act of each one of the conspirators being, in contemplation of law, the act of each and all. *Miller v. State,* 25 Wis. 384; 12 C. J. p. 577, § 86, and cases cited. See note, 'Responsibility of one assisting in robbery during which his companion commits murder,' 45 L. R. A. (N. S.) 55.

"It is equally true that each of the conspirators is responsible for everything done by his coconspirators which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the original design or common plan. *Miller v. State, supra; Boyd v. United States,* 142 U. S. 450,

12 Sup. Ct. 292. So it has been held that where there was a conspiracy to rob in which a defendant participated and in the perpetration of which a murder was committed by his associate, he is as guilty of murder as if he had actually done the killing himself, and it is no defense that the defendant did not intend that a life should be taken on the perpetration of the robbery or forbade his associate to kill. *People v. Lawrence,* 143 Cal. 148, 76 Pac. 893, 68 L. R. A. 193; *Hayes v. State,* 112 Wis. 304, 87 N. W. 1076. . . . Under the undisputed facts in this case the defendants were guilty, if guilty at all, as coconspirators with Peters. How then could they be guilty, if guilty at all, of any other offense than that of which Peters was guilty? Upon authority of the cases already cited it is well-established law that the act of one conspirator is the act of all. His intent is the intent of all, and if the defendants are guilty as coconspirators then they must be guilty of the same offense. If Peters was guilty of murder in the first degree, then these defendants could not be guilty of murder in the third degree because the act of Peters was their act, being coconspirators; his intent was their intent. 45 L. R. A. (N. S.) 55, and cases cited."

It is our conclusion that the defendant was not prejudiced by the failure of the court to submit separate verdicts.

The defendant next contends that the court erred in permitting Beckman to testify that he participated in another holdup prior to November 23, 1932, in which crime the defendant did not participate, and in permitting the defendant, Beckman, and Dolezar to testify that a week or ten days after November 23, 1932, the date of the Healy murder, they participated in another holdup.

Ordinarily, upon the trial of a person charged with a particular offense, evidence tending to prove that he had committed other distinct offenses is incompetent and generally prejudicial. *Topolewski v. State,* 130 Wis. 244, 249, 109 N. W. 1037; *Paulson v. State,* 118 Wis. 89, 94 N. W. 771; *McAllister v. State,* 112 Wis. 496, 88 N. W. 212. However, under the undisputed circumstances of this case, where it was shown beyond any doubt that the defendant entered into the

conspiracy to hold up and rob the Healy filling station (which conspiracy was conceded by the defendant and also by Beckman and Dolezar), that the Healy station was actually being held up pursuant to the conspiracy and that all three conspirators were concededly present participating in the holdup, we conclude that the defendant was not prejudiced by the admission of the evidence to which complaint is directed. Had the defendant not been present at the place of the crime, had he asserted that he was not present, had his identity been questioned, or had he denied entering into the conspiracy with his associates to rob the Healy station, a different question would have been presented. Under the circumstances assumed, the defendant would have been prejudiced by the admission of evidence showing or tending to show his connection with other distinct crimes.

The defendant finally contends that his guilt was not proven beyond a reasonable doubt. It is not contended that there can be any doubt regarding the fact that the defendant deliberately and fully entered into the conspiracy to hold up the Healy station, or regarding his actual participation in the attempted robbery. The facts that he did not enter the station, did not wield the revolver, and did not actively participate in the physical encounter or fight between Dolezar and Healy, but remained at the wheel of the automobile so as to further a speedy getaway after the commission of the robbery, did not, under the law, render his guilt less in degree than that of Beckman and Dolezar who went into the station.

"One of two persons who confederate to commit a robbery may be convicted of murder in case his companion kills the one upon whom the felony was to be committed in carrying out the enterprise, although the killing was not intended, and the accused only remained to watch while his companion attempted to secure the money." *People v. Friedman,* 205 N. Y. 161, 98 N. E. 471.

This case is reported in 45 L. R. A. (N. S.) at page 55. In the note which deals with the responsibility of one assist-

ing in robbery during which his companion commits murder, it is stated:

"The general rule is that if a number of persons agree or conspire to commit and enter upon the commission of robbery, all are criminally responsible for the death of a person that ensues as a natural consequence or in furtherance of a common purpose, although the one accused may not have done the actual killing." (Citing numerous cases to support the rule.)

It is our opinion that the evidence adduced upon the trial was amply sufficient to support the verdict of the jury and to prove the guilt of the defendant beyond a reasonable doubt. There is nothing in the record which would permit us to say that justice has probably miscarried or which would warrant us in granting the defendant a new trial, pursuant to sec. 251.09, Stats.

*By the Court.*—Judgment affirmed.