MANDELLA, Plaintiff in error, vs. THE STATE, Defendant in error, and three other cases.

*October 17—November 18, 1947.*

*Eugene J. Sullivan* and *James A. Fitzpatrick,* both of Milwaukee, for the plaintiffs in error.

For the defendant in error there was a brief by the *Attorney General, William A. Platz,* assistant attorney general, and *Urban J. Zievers,* district attorney of Kenosha county, and oral argument by *Mr. Stewart G. Honeck,* deputy attorney general, and *Mr. Zievers.*

FRITZ, J.   On their writs of error the defendants, John and Jerome Mandella and Dominic Lampone, contend that the circuit court erred in overruling their pleas in abatement which were based on the ground that on their preliminary hearing there was not sufficient evidence to warrant the municipal court in holding that either of the crimes charged in the informations ultimately filed against them was committed by them; and that there was no reasonable ground to believe any of them committed the offenses charged or to warrant binding them over for trial in the circuit court on those charges.   Furthermore, each of said defendants, and likewise the defendant Louis M. Fazio, on his writ of error, contends that the court erred as to each of them in denying his motions for a separate trial and for a directed verdict and his discharge, for the setting aside of the verdict, and for the granting of a new trial for the reason that there was no credible evidence in the record sufficient to support the verdict of guilty.

In relation to the contentions on behalf of John and Jerome Mandella and Dominic Lampone that the circuit court erred in overruling their pleas in abatement, it suffices to state that, upon reviewing the evidence introduced at the preliminary hearing, it is our conclusion that there was enough evidence to warrant the charge against each defendant of murder and also assault with intent to murder.   At said hearing no evidence was offered by defendants to establish their respective alibis upon which they subsequently relied on the trial.   On the other hand there was evidence to warrant finding (briefly stated)

that during the night of March 12, 1946, after three radios and a fur coat had been stolen from John Mandella's home in Milwaukee and hauled to Kenosha in a truck occupied by Mike and Joe Farina and Tony Bruno, the defendants Fazio, Lampone, and Jerome Mandella, riding in an automobile operated by John Mandella, jointly participated and co-operated,—after John Mandella drove in such manner as to compel the halting of the truck in which the Farinas and Tony Bruno were riding, —in endeavoring to compel them to admit the theft and disposition of the radios; and that in the course of the joint activities of all defendants to that end, they participated in brutally mistreating and threatening the Farinas, and while doing so, with Lampone in the driver's seat of the truck and Joe Farina on the floor in the rear part thereof, and Mike Farina attempting to come to his aid by entering the front right door thereof, the latter was killed and Joe Farina was seriously wounded by shots fired at them by Fazio.    Consequently the court did not err in overruling the pleas in abatement.

In support of the defendants' contentions that the circuit court erred in denying their motions for a directed verdict and to set aside the verdict and grant a new trial on the ground that there was no credible evidence sufficient to support the verdicts of guilty, each defendant claims that Joe Farina's testimony is wholly uncorroborated in its essentials and is insufficient to sustain a conviction, and is even contradicted by other state's witnesses; but that the testimony on behalf of each defendant is corroborated in every essential detail and maintained his innocence at all times.

It is true that the evidence necessary to support the jury's verdict of guilty as to each defendant consists largely of the testimony of Joe Farina and that his testimony is somewhat contradicted by other state's witnesses in a few respects which are, however, not fatal or even so serious as to render his testimony in relation to the facts essential to sustain the verdict and judgment incredible or insufficient.    He and Tony Bruno are

the only surviving witnesses as to the concerted acts and conduct of the defendants which led up to and culminated in the shooting by Fazio of the bullets which resulted in wounding Joe Farina and the killing of his brother Mike. Until shortly prior thereto Tony Bruno had been with them, but, as will appear from the evidence as to facts hereinafter stated, he escaped somehow unscathed before the shots were fired and showed up in Milwaukee early the following day not seriously injured.

By the defendants themselves there was no testimony whatever given or introduced as to the immediate events which preceded or occurred at the time of the attack and shooting of Mike and Joe Farina. On the contrary, as their defense, each defendant pleaded and offered proof solely in support of an alibi.

On the trial there was testimony by Joe Farina, which, if the jury was satisfied of the truth thereof beyond a reasonable doubt, warranted the jury in finding facts to the following effect. About 3 o'clock a. m. on March 13, 1946, while Mike and Joe Farina were in a Plymouth panel truck, with the painted lettering ".A. C. Window Cleaning Company," on a highway in Kenosha county, Mike was killed and his brother Joe was seriously wounded by shots fired at them by the defendant Fazio. In the early evening of March 12, 1946, the Farina brothers,—accompanied by Tony Bruno,—had driven to the home of John Mandella in Milwaukee and there they stole three radios and a fur coat and drove to Kenosha, where Mike sold the radios. Several hours later they started back toward Milwaukee, with Joe driving the truck; and while still in Kenosha county, the truck was forced to the side of the road and compelled to stop by a Chrysler car known to be customarily used by John Mandella. Thereupon, as Joe Farina testified,—

We pulled over to the side of the road and got out. . . . Mike was about the first guy out and Bruno and I were getting out about the same time. We got around the back; by that

time the fellows in the other car were out already. By the time I got back there I could hear a lot of swearing and cussing. Well, at the time when I first got out I couldn't see who it was; the lights blinded me. I moved to one side, then seen who it was. It was John Mandella and his brother Jerry, Fazio, and Lampone. (Witness identified defendants in court as being the men he referred to.) I heard John yell at Mike saying something about "you thought we wouldn't find you, but"—well, they were telling us how slick they were that they found us and that we didn't have a chance to get out of there, and that they had all the roads blocked. . . . They were swearing at each other and calling each other names. John was asking Mike where the radios were. Mike said he didn't know anything about where the radios were. He denied it. They asked us if we had guns and we told them we didn't. They argued some more. Well, they kept that up quite a while and every time they kept arguing the words got harsher —worse and worse; and every time they would get up to a certain point they would ask us if we had guns again. . . . After a while, I don't remember who it was, but one of them sort of "kinda" frisked us to see if we did. They were sure we didn't have any; then right after that is when they stuck their hands in their pockets as if they had guns in their pockets, and you could see the outlines and everything of them; and they pointed them at us and they told us to get in the Chrysler. . . . It was Jerry and Fazio who put their hands in their pockets and I could see the outline of the guns. Somebody, I think it was John, told Lampone to drive the truck in the ditch off the road which he did. They all told us to get into the Chrysler and we all got into the Chrysler and I started to reach to close the door and one of them, I think it was Fazio or Jerry, thought I was going to try to run. One of them jumped up and grabbed me by the back here (indicating) and held on tight, jerked me back and slammed the door. . . . John Mandella was driving; I was sitting next to him; we were the only two in the front. Jerry was in the left side of the car right behind the driver, then came Tony Bruno, then Mike, and Fazio on the inside. . . . They made a U-turn and started south toward Chicago then. Along that time, Mandella would ask where the radios were— and Mike would deny it—and about that time they would start cussing, calling him a son-of-a-so—well, they—then about that

time he said, "you son-of-a-bitch," and he said, "You ain't going to get back to Milwaukee alive." Jerry said that. He said to Mike, "I am going to kill you." John would repeat that, he would swear, say, "You son-of-a-bitch, you ain't going to get back to Milwaukee," and this and that, all that cussing. He was assuring us that we were not going to get back to Milwaukee, that he intended killing us. That remark was made a lot during that arguing. They kept bragging about it and boasting about it, that they were going to kill us and how tough they were going to be. . . . The remark about getting back to Milwaukee alive was made about three or four times or better by Jerry and John; it was in between them, a couple of them. In the car at the time were John and Jerry, Fazio, Bruno, Mike, and I. After they were hollering a lot and trying to prove how tough they were and one was trying to outshout the other that we weren't going to get back alive, somebody said we should wait for the truck, pick up the truck. So John slowed up, opened the door and hollered out to somebody to get the truck. . . . Well, one time during the earlier part when we were first told to get in the car and heading south Fazio showed a gun; and Mike thought that that was a gun that was stolen from our gas station; and he cussed at Fazio and told him, "So you are the guy who stole the guns out of the station." I was sitting in the front seat and when I heard that I wanted to look, and I started to turn around; and Jerry jumped and slapped me across the back of the neck with the bottom part of his hand. There was other striking in the car; they were punching back and forth all the time; they were doing the punching. I was grabbed by the collar, pushed around. John Mandella was sitting alongside of me. He had a ring on his hand; he came up with a sideswipe and hit me across the face over here. John hollered out, "Go back and get the truck." And Mike says there wasn't any gas in it—well, there was a lot of gas in it, over half a tank. . . . We started down the road and somebody said, "Drive slow till they catch up with us." . . . In a little while the truck caught us, drove up behind us. They both stopped. Fazio got out, opened the door in the front where I was, pointed a gun at me and told me to get out, grabbed me, pulled me out, pushed me a little, told me to get in the truck. He told me to get . . . on the floor, and lay down on the floor in the corner. I laid on the floor in the corner.

There was a box in there; he sat on a box. He was sitting here (indicating); I was down on the floor over there. That is when he started asking me all kinds of questions about where we came from and about his house being robbed and a watch. . . . It was just before I would get through telling him, he would always come up with a slap or something. He asked me if I knew who he was. I told him I didn't; I had heard the name before and naturally when I heard somebody say "Fazio" I looked to see who "Fazio" was. I had heard the name "Fazio" earlier in the evening. . . . Getting back to the conversation and activity in the truck, he asked me if I knew who he was and I told him I didn't but I knew his name. So he gave me a sort of a dirty look. He said, "You son-of-a-bitch you ain't going to remember it long;" and he came across with the side of his gun, cracked me across the face on this side (indicating). At that point Lampone was driving and Fazio was right in front of me. The truck was not in motion, it was stopped, parked behind the Chrysler. They were arguing in the front car; you could hear commotion up there. Lampone was sitting in the driver's seat. I was in the back of the truck on the floor right next to him and Fazio was sitting practically on the box, looking down at me. When he cursed at me that time he struck me across the face. . . . Then a little later, after this kept up for a while, the cars started up there, both of them, and they went down the road a little ways; then they stopped again. Fazio in the meantime was still clubbing me with that butt of the gun and asking me questions and Fazio got out of the car when he was stopped again, and started heading toward the Chrysler for the few minutes that he was gone. I was beaten around quite a bit with that butt of the gun; I was sniffling a little bit. Lampone told me that if I didn't shut up he was going to give me some more so a little later Fazio came back again and then Fazio opened the door. He looked at me first; then when I seen the door open, I looked up like that (indicating). He looked at me; he kept staring; and then he pulled up the gun and started shooting at me. I could see the sparks coming at me, I could feel my head tugging around, blood squirting out; I started to sag forward and I was getting "ringy" sounds in my head, and I was realizing then I was shot, that he was shooting at me. I wasn't sure where the first couple hit me but I was hit twice in the head,

three times through the hand, five altogether. Fazio was facing south—with the front end of the truck facing south, he was on the right side by the door and I was in the back of the truck. Fazio was about six feet from me then. Well, when these bullets struck me, I could hear somebody fighting outside. And it wasn't long before the door flung open and Mike come running in. Mike must have been the guy that was fighting outside; he was trying to break away when he heard the shooting; and he broke to the truck and started asking me what was happening, wanted to know if those shots hit me. He came in when he heard those shots, wanted to see what happened. He said,. "Joe, are you hurt? What's the matter?" He didn't get to finish it altogether because when he started to come in they started shooting him from there. They shot him in the back and all over. His back was turned; he was coming toward me and he was in the air and I could hear that shooting; then he just fell from thin air and fell across me. . . . Well, he didn't move. I looked up after he fell on me; I was still sagging over, bleeding. I seen Fazio and somebody else standing by the door. They seen I was sitting up so they started shooting again. Well, if they thought I wasn't dead he would shoot again; I figure they seen me sitting up. . . . I fell over Mike, poked Mike, told him to pretend he was dead, in Italian, that he shouldn't move. But he didn't answer. So they slammed the door and one was asking the other one if they were sure we were dead. John was asking Fazio if we were dead, and Fazio was pretty sure we were. John asked "Are you sure they are dead?" and Fazio said, "With all those slugs in them they should be." Next they slammed the door and I could hear them running to the Chrysler; it was parked in front of us. I could hear the door slamming, motor driving away. Well I waited maybe thirty seconds, half minute, somewhere around in there, before I picked myself up. I thought maybe they might still be around. I came up slow and knew the distance by the sound fading away just how far they were. I started to pick myself up. I could see the car, from where we were, head up to the stop lights and start to make a turn left. . . . After I saw the car reach the stop light I got a glimpse of them starting to turn left and I came back down again and I pushed Mike and he didn't move. So I got up again; I looked around again, seen there wasn't anybody in sight so I lifted Mike off me and

stumbled into the driver's seat, was fumbling around for keys. . . . I started the motor up, started in gear, starting to go out. . . . About that time, a little before that, just about when I was in the driver's seat starting the motor, a truck passed me. . . . I started after the truck and caught up to them. . . . Finally we came to the cross section; . . . I seen he was starting to slow up and pulled in front of him. . . . I told the guy if he could get some help and a doctor, that we were both shot, two of us were shot and we were bleeding bad. . . . I told him I was shot; and he said, "Who did it?" And I told him. I said, "Remember their names, Fazio and Mandella." And he said, "Who?" And I repeated it again. I said, "Ask the police in Milwaukee; they will know; just remember those names, Fazio and Mandella." Well, about that time then he settled around. . . . Somebody upstairs turned on a light and told us they would be right down. . . . A little while later while I was sitting there, the sheriff's department car drove up . . . and they asked me what was the matter; and I told them we were shot. . . . He asked me, he said, "What happened?" I told him, "We were shot." He said, "Who did it?" I said, "Fazio and Mandella." And I said that over and over again. Then I thought, well, Mandella would only mean one, so I tried to tell them there was two Fazio—I mean two Mandella brothers; you see?"

In several material respects the above-stated testimony of Joe Farina is corroborated by the testimony of other witnesses. Thus, Earl Kenelly, who drove a southbound truck on the highway in question, testified that at 2:30 a. m. or between 3:15 and 3:45 a. m. he saw a panel truck and a car ahead of it facing the ditch with the rear end of the car hanging out and blocking half of the highway, so that he had to slow down as he went by. The car was a dark green modern type, but not torpedo style. The Plymouth panel truck (which he was requested on the trial to see at the Kenosha jail) resembled the "A. C. Window Cleaning Company" truck; and the Chrysler car of John Mandella (which Kenelly saw also at the jail) resembled the rear end of the car he saw on the highway. Arnold Haling, the driver of the southbound truck which was

stopped by Joe Farina at the filling station, corroborated Joe's testimony that he said the man's name who shot him was "John Mandella," and also said "Milwaukee police know all of them." Albert Bornhuetter, a deputy sheriff, testified that while at the filling station, Joe Farina mentioned the name of "Di Fazio," and later said "Fazio;" and that Farina also mentioned the name "Fazio" while riding to the hospital and again while on the hospital operating table. Joe Farina's testimony that he and Mike had been severely beaten is corroborated by testimony of Dr. Kappus, who examined Joe at the hospital; and by the testimony of Dr. Kuzma, who examined Mike's body at the morgue. In addition there was the corroborating testimony given by Mrs. Grace Torcivia, who resided at 508 North Twenty-Ninth street in Milwaukee, and who is a sister of the Farina brothers. She testified she retired about 10:30 on the night of the shooting, and was awakened about 12:30 by a man knocking on her door, "and this man was very excited that came at my door; and he asked me——." (As she could not identify him she was not permitted to testify as to what the man asked.) However, she testified also that after the man left she saw him meet John Mandella outside "and they went across the street, and there was a car parked there. John sat at the driver's seat, and the other one went around the other side in the front seat."

In support of their respective alibis, each of the defendants testified and offered also other testimony by which they sought to prove that during all of the night in question they were in Milwaukee, and as to their whereabouts there. The alibis of John and Jerome Mandella and Lampone depended on the testimony of themselves and members of their families. They were in accord in stating that John Mandella and Lampone were together a large part of the evening, and also agreed to the extent that in the later part of the evening they arrived at about 10:45 at a tavern on Van Buren and Brady streets in Milwaukee, belonging to the husband of a sister of the Man-

dellas. John Mandella testified that shortly after arriving there his wife telephoned to him that their house had been ransacked and he arrived there in five or six minutes; and they and their child all went to bed in an hour and a half, and he did not leave the house again that night. He denied he was in front of Joe Farina's sister's home that night about 12 o'clock; or that he went out looking for Mike Farina or that he saw his brother Jerry (Jerome) that night.

Dominic Lampone testified that after arriving with John Mandella at the Highway Tap tavern he stayed about half an hour and then went on the streetcar to his home, arriving there at 11:50 p. m. and went to bed there to sleep at five or ten minutes after 12, until he got up about 7 o'clock a. m. He denied that he was in or near Kenosha county during the night in question.

Jerome Mandella testified that on March 12, 1946, he was at home until 9 or 9:30 o'clock p. m. when he left his tavern in Milwaukee to go about two and a half miles on the streetcar to his sister's Highway Tap tavern to get some change, and that he left there about 12:30 or 1 o'clock a. m. and got home about 1:15 a. m., and went to bed and stayed there. He testified he was not in Kenosha county that night nor did he see then his brother John or Dominic Lampone or Louis Fazio.

In addition to his own testimony and that of his wife, Louis Fazio's alibi was supported by six witnesses who testified, as Fazio did, that after he went to work at 10 p. m. at Pick's Music Box in Milwaukee, he spent the entire night up until 5 a. m. playing cards there. Two of his witnesses, Sam Cefalu and Leonard Mercurio, had previously given contrary statements to the police, which were used to impeach them. John Latona testified he saw him there at midnight and at 5 a. m., but did not know if he was there between those times.

As all four defendants denied being in Kenosha county at the time of the attack and shooting of the Farina brothers, the

only witnesses thereof are the two survivors, Joe Farina and Tony Bruno, who are the only witnesses who were in a position to describe what happened. Bruno, after first testifying at the trial of his having been subdued by a blanket thrown over his head by those who attacked the Farinas and him, changed his testimony by stating that he escaped into a corn or oats field, after an encounter with four alleged Chicagoans in connection with their hijacking alcohol trucks. But his testimony was so inconsistent and contradictory that his conflicting stories were virtually considered unreliable and incredible by all of the parties, and his conflicting testimony as to his alleged escape were evidently given no credence by the jury. However, as he was present at and prior to the shooting, the prosecution had called him to testify, although he was an obviously untrustworthy witness. Under the circumstances, as his testimony is contradictory, the jury could believe and accept such parts thereof as it found to be most credible. *O'Neil v. State,* 237 Wis. 391, 399, 296 N. W. 96; *State v. Guilfoyle,* 109 Conn. 124, 145 Atl. 761, 765.

Consequently, there remained in respect to what happened and who the participants were, and what each then did in the course of the assault upon and shooting of Mike and Joe Farina, only the latter's testimony; and if the jury considered his testimony credible and was satisfied beyond a reasonable doubt of the truth thereof in relation to the identification and active participation of the four defendants therein, and, on the other hand, found defendants' proof to establish their respective alibis to be incredible, it was under the evidence herein clearly within the province of the jury, as the triers of the facts to find each of the defendants guilty, as stated in the verdict. Consequently, as it is evident from the verdict that the jury was satisfied that John and Jerome Mandella and Dominic Lampone were present aiding and abetting in the attack upon Mike and Joe Farina immediately preceding and up to and including the shooting of them by Fazio, every

one of the four defendants is guilty and can be, on well-established principles, convicted and sentenced for the offenses charged in the informations. Sec. 353.05, Stats.; *State v. Henger,* 220 Wis. 410, 416, 264 N.W. 922; *Pollack v. State,* 215 Wis. 200, 211, 253 N. W. 560, 254 N. W. 471; 1 Wharton, Crim. Law (12th ed.), sec. 258.

In support of the contentions by Lampone and John and Jerome Mandella that the court erred in denying their motions for separate trials, the claim (1) that the denial permitted the state to introduce evidence which would not be admissible against each of them if he had a separate trial, and (2) that they had antagonistic defenses. Defendants' contentions cannot be sustained. As stated in *Smith v. State,* 195 Wis. 555, 558, 218 N. W. 822,—

"The granting or refusal of a separate trial of defendants in a criminal case rests largely in the discretion of the court, where the offenses arise out of the same transaction. Joint trials ordinarily facilitate the speedy administration of justice, and on an application for separate trials the issue presented to the court and which it is called upon to determine consists of the question whether justice will be done by granting the motion."

Consequently, when "there is nothing in the record showing any abuse of discretion on the part of the trial court in denying the motion for a separate trial, that ruling must be sustained." *Kluck v. State,* 223 Wis. 381, 387, 388, 269 N. W. 683. The purport of virtually all of the evidence introduced by the state was to establish the offenses with which each defendant was charged by reason of their joint participation in all of the acts and conduct committed in the presence of each other, which resulted in attacking Mike and Joe Farina, and killing Mike and wounding Joe by shots fired by Fazio. All of said acts and conduct of defendants were involved and material in establishing the guilt of each of them, and under the circumstances there was in that respect no evidence admitted

over objection which was admissible against only one or some of the defendants, but not admissible against all of them. It was only in their attempts to establish their respective alibis that there was some evidence introduced on behalf of some of them,—and particularly Fazio,—which was not applicable also to all codefendants. However, none of the evidence thus introduced by any defendant in relation to his alibi was antagonistic in any respect to any other defendant. On the contrary, the fact that all of the alibis were based on testimony which was contradictory to Joe Farina's testimony as to the presence and participation of all defendants in the commission of the offenses charged was more likely to be a decided advantage to each of them. Thereby each would probably have been benefited if the jury had believed the evidence relied upon to establish the alibi of any one (or more) of the four defendants, since that result would have been likely to discredit and affect the jury's determination as to the truth of Joe Farina's testimony to such an extent that the jury would have been apt to acquit all defendants. Thus instead of being antagonistic their alibi defenses, based on their evidence in contradiction to that of Joe Farina, were rather complementary, and in this respect tended to support each other. As Joe Farina was definitely and unalterably committed by his testimony to the facts that all of the four defendants were present at the scene of the crime, if the jury had had, under the evidence, any reasonable doubt as to the presence of any one of them, all of Farina's testimony, in that as well as in all other respects, would probably have been considered incredible by the jury, and resulted in acquittals. Consequently, the court's denial of separate trials was neither prejudicial to defendants nor was there any abuse of discretion in this respect. *Kluck v. State, supra.*

*By the Court.*—Judgments affirmed.