STATE, Respondent, v. NUTLEY, Appellant.*
SAME, Respondent, v. NICKL, Appellant.*
SAME, Respondent, v. WELTER, Appellant.*

*June 5—June 30, 1964.*

---

* Motions for rehearing denied, without costs, on September 11, 1964, BEILFUSS and HEFFERNAN, JJ., not participating.

528

530

536

For the appellant Nutley there were briefs by *Jack Mc-Manus*, attorney, and *J. Philip Elliott, Jr.*, of counsel, both of Madison, and oral argument by *Mr. McManus*.

For the appellant Nickl there was a brief by *Aagaard & Wiley* and *John M. Wiley*, all of Madison, and oral argument by *John M. Wiley*.

For the appellant Welter there was a brief and oral argument by *Vaughn S. Conway* of Baraboo.

For the respondent the cause was argued by *Betty R. Brown*, and *William A. Platz*, assistant attorneys general, with whom on the brief was *George Thompson*, attorney general.

WILKIE, J. Numerous issues are presented on this appeal. We will consider these issues, which are in the main common to all three cases, in the order in which they arose at the trial.

1. *Was the jury array for the term of circuit court, in which this action was litigated, constituted in violation of the provisions of secs. 255.04 through 255.07, Stats., thereby entitling the appellants to a new trial before jurors drawn from a properly constituted array?*

Sec. 255.04, Stats., sets forth the method for constituting an array from which the ultimate jury of 12 in a criminal case may be drawn. Basically, three jury commissioners have the responsibility of jointly determining the qualifications of not less than 300 nor more than 500 persons who

shall be members of the array from which final jurors are chosen. In addition to evaluating individual jurors by the standards set forth in sec. 255.01, the commissioners are to apportion the array "as nearly as practicable among towns, villages and wards of cities thereof in proportion to population according to the last national census." Sec. 255.04 (2) (a).

Just prior to the opening of the trial (on February 8, 1962), counsel for defendant Welter made a motion challenging the legality of the array. The written motion simply stated the ultimate legal conclusion that the array was not properly constituted. Neither of the other defendants or their counsel made any objection to the array before or during the trial. The trial judge allowed counsel for Welter to state his objections more fully and concluded that a motion on behalf of one defendant was deemed made on behalf of all three. Thus it appears that the challenge to the array was timely, and the issue of whether the trial court erred in overruling the challenge is properly before this court.[1]

In proceedings held *in camera* but on the record, the trial court permitted counsel to give his detailed reasons for objecting to the array. The clerk of circuit court for Dane county acknowledged that she maintained no single unified list of the names of members of the array certified by the jury commissioners. She stated that each commissioner submitted names individually. However, it does not follow from these facts that the commissioners did not *jointly approve* of each person prior to individually communicating the results of such collective action to the clerk of court. Each could have had a list of persons for jury service, submitted such list to the other commissioners for approval, and then, after receiving the approval of his fellow commissioners, relayed the names to the clerk of court. The defendants offered no affirmative proof that the method of joint con-

---

[1] *Ullman v. State* (1905), 124 Wis. 602, 607, 608, 103 N. W. 6.

sultation and collective approval was not utilized as the mode of selection for the array. The mere absence of a jointly certified list is not a material violation of sec. 255.04, Stats.[2] The substantive method of choice which was *in fact* utilized is the crucial element, rather than the document which stands as a *symbol* of the approved method. The defendants crucially failed to offer any affirmative proof before the trial judge that a method other than joint consultation and approval was utilized to pick the array from which the ultimate jury was chosen.

The defendants also failed to offer any proof before the trial court that the array was not apportioned among wards, villages, and towns on a per capita equality standard. This provision assures each person in the county of an equal opportunity to serve upon a jury regardless of where he may reside within the county. A defendant is also assured by this provision that the array is as representative of community character as is practicable.

In their motions for a new trial and in their arguments to this court, the defendants offered as proof of the violation of the statute an opinion of the circuit court for Dane county, rendered in an entirely different case, which opinion is dated October 11, 1962, nearly eight months after the verdict in the instant case. (State v. Offerdahl and others.) In that opinion the Dane county circuit court concluded that the method for selecting the jury array utilized in Dane county as of the first Monday in April, 1962 (involving a completely new jury array selected after the trial in the instant case was concluded), failed to comply with the statute (sec. 255.04) in several material respects.

Such an opinion of a circuit court rendered in an independent action, subsequent to the completion of earlier litigation, cannot be deemed evidence of propositions in issue in the original litigation. We must conclude that since the

---

[2] *Ullman v. State, supra.*

record in the case at bar is barren of any substantive evidence of violation of secs. 255.04 through 255.07, Stats., in any material respect, the trial court committed no error in overruling the challenge to the jury array.

Although we have found no error in overruling the instant challenge to this particular jury array, we take this opportunity to stress the importance of the proper selection of the jury array. Substantial compliance with the provisions of ch. 255, Stats., will insure that jurors will be selected only after careful deliberation as to their qualifications, and only after every effort has been made to pick a truly representative group from the community in which legal controversies are to be tried.

*2. Did the trial court abuse its discretion in transferring venue of the action from Sauk county to Dane county?*

On motions of the defendants, and upon a finding of community prejudice, the trial court transferred venue of the action from Sauk county, where the episode in issue occurred, to Dane county, pursuant to the provisions of sec. 956.03, Stats.[3]

At the initial hearing on defendants' motion conducted in Sauk county, evidence was offered to demonstrate that a primary cause of community prejudice in Sauk county was the reports and activities of mass-media institutions in Madison. Therefore, the defendants argue that persons in Dane county (being exposed to the same influences) were as likely to have predetermined the issues as persons residing in Sauk county, and the action should have been transferred to any county adjoining Sauk other than Dane.

Whether or not all defendants objected to a transfer of venue from Sauk to Dane at the original hearing in Sauk

[3] "956.03 CHANGE OF VENUE OR JUDGE. (3) *Community Prejudice.* If a defendant who is charged with a felony files his affidavit that an impartial trial cannot be had in the county, the court may change the venue of the action to an adjoining county. Only one change may be granted under this subsection."

county, we need not decide. At least one defendant urged that venue be transferred to an adjoining county other than Dane, and the trial court had before it evidence of the fact that persons in both communities were exposed to the same mass-media reports and hence were equally likely to have predetermined the defendants' guilt. The merits of this claim are properly preserved for this appeal.

Nevertheless, the trial court's decision to transfer venue from Sauk to Dane was a proper exercise of its discretionary power under sec. 956.03, Stats.[4]

While persons in Sauk county and in Dane county were exposed to the same mass-media influences, this exposure alone was not the *sole* cause of community prejudice in Sauk county. Persons residing in Sauk knew Jantz and Kohl personally. A strong desire on the part of jurors to "do justice" for victims of a crime whom they may know personally, could well color the jurors' perceptions of the events in issue to the prejudice of any defendant. Persons residing in Dane county, although apprised of certain elements of the episode by mass media in advance of the trial, were less likely to approach the issues in this case with strong discoloring feelings of remorse for the victims predicated upon personal relationships with either Kohl or Jantz. Further, the trial court could reasonably conclude that mere exposure to the reports of mass media alone did not create a deep pattern of community prejudice in Dane county. The effect of mass-media reports upon community attitudes is a matter which cannot be determined with precision in any given case.

Therefore, the trial court could within its discretion properly conclude that the atmosphere in Sauk county and in Dane county was not identical, and that Dane, as an adjoining county, was a reasonably nonprejudicial site for the trial.

[4] *Schroeder v. State* (1936), 222 Wis. 251, 267 N. W. 899.

*3. Were each of the three defendants improperly joined with the others for a consolidated trial of the matters in issue?*

Whether a joint trial of codefendants for their respective conduct in relation to a single episode is unduly prejudicial to each defendant is a matter within the discretion of the trial judge.[5]

The prosecution of these defendants was predicated upon their respective conduct in relation to a single episode. As will be detailed later in this opinion, the theory of the prosecution was that each defendant was liable as a principal for the substantive crimes of first-degree murder and attempted murder, because each was a member of a conspiracy to commit the crime of resisting an officer,[6] and the substantive crimes of first-degree murder and attempted murder are the natural and probable consequence of a conspiracy to violate sec. 946.41, Stats.[7] Alternatively, the prosecution theory sought to demonstrate that defendant Welter directly committed each crime, while defendants Nutley and Nickl were liable for the substantive crimes because they aided and abetted Welter in his direct commission of the offense. Under these circumstances, where the liability of each defendant turns upon his relation of his conduct to the conduct of the other defendants during the course of a single episode, the prosecution may try all defendants in a single consolidated trial, utilizing a procedural mechanism which is consistent with the theory of its case, and thus avoid repetitious

[5] *Mandella v. State* (1947), 251 Wis. 502, 29 N. W. (2d) 723; *Kluck v. State* (1937), 223 Wis. 381, 269 N. W. 683; *Pollack v. State* (1934), 215 Wis. 200, 253 N. W. 560, 254 N. W. 471. A similar rule applies in the federal system—*Olmstead v. United States* (1928), 277 U. S. 438, 48 Sup. Ct. 564, 72 L. Ed. 944.

[6] Sec. 946.41 (1), Stats.

[7] Sec. 939.05 (2) (c), Stats.

litigation and "facilitate the speedy administration of justice."[8]

Assuming the above conditions are satisfied, the individual defendants may still obtain a severance if a joint trial would be prejudicial to their individual interests. "Prejudice" in this sense, means that an entire line of evidence relevant to the liability of only one defendant may be treated as evidence against all defendants by the trier of fact simply because they are tried jointly. Again, if the defendants assert antagonistic defenses, they will often face the double burden of meeting the attack of both the prosecution and their codefendants. Therefore, we have held that if codefendants assert antagonistic defenses, they are entitled to separate trials.[9]

In the context of this case, the defendants would have asserted antagonistic defenses if each had asserted that he had not joined the conspiracy formed by the others, or had remained passive (or even resisted) while the others executed the crimes in question. However, in fact, the defendants maintained equivalent defenses. Each denied any conspiracy and claimed in effect that Jantz and Kohl shot each other during a general melee instigated by the officers. The liability of each depended upon the probative value of a single defense version of the events in issue.

Moreover, all evidence offered by the prosecution, given its theory of liability as conspirators or alternatively as aiders and abettors, was equally relevant to the guilt of each defendant, with one exception.

Evidence of an attempted jailbreak by Welter and Nutley was offered as circumstantial evidence of their guilt of mur-

---

[8] *Smith v. State* (1928), 195 Wis. 555, 558, 218 N. W. 822. See also *Mandella v. State, supra; Pollack v. State, supra.*

[9] *Mandella v. State, supra; Pollack v. State, supra.*

der and attempted murder. Although the jailbreak evidence on the part of these two men is not directly relevant to Nickl's liability, the trial court went to great length to point out this lack of relevancy to the jury and to emphasize that this particular line of evidence went to the liability of Welter and Nutley *alone.*

Therefore, we conclude that the refusal of the trial court to grant each defendant a severance was not an abuse of its discretion.

Defendants Nutley and Nickl argue that the joint trial was prejudicial to their individual interests because the trial court on some 80 occasions ruled, with some elaboration of reasons, that questions asked by counsel for defendant Welter were neither relevant nor proper. On some of these occasions the court would urge Welter's counsel to proceed with his examination in a more direct fashion. Nickl and Nutley argue that the jury, in all probability, became antagonistic toward Welter because of the conduct of his counsel, and that this general feeling of hostility was then directed to all defendants.

It is true that a court may order a severance during a trial if it appears that the course of events is running to the prejudice of some codefendants.[10] However, in the instant case neither Nickl nor Nutley protested the conduct of Welter's counsel during the trial; nor did they move for a severance after the trial began basing their motion upon the courtroom conduct of Welter's counsel. Assuming arguendo that the trial court's numerous rulings against Welter's counsel and its commentary upon such rulings worked to the detriment of the codefendants, they cannot passively accept this situation at the trial and then, after the fact, claim on appeal that an atmosphere of hostility generated

---

[10] *Opper v. United States* (1954), 348 U. S. 84, 75 Sup. Ct. 158, 99 L. Ed. 101. *State ex rel. Nickl v. Beilfuss* (1961), 15 Wis. (2d) 428, 113 N. W. (2d) 103.

by the conduct of a codefendant's counsel, worked to their disadvantage.

4. *Did the presence of a juror on the ultimate panel, who had expressed a predetermined opinion as to the defendants' guilt, deprive the defendants of their right to an impartial tribunal guaranteed by sec. 7, art. I of the Wisconsin constitution, and the Fourteenth amendment of the United States constitution?*

During the course of the *voir dire* examination, one juror acknowledged that he had formed an opinion as to the guilt of the defendants. The court then instructed him that he was to disregard any information he received relating to the case, outside of the evidence offered during the course of the trial. The court expressly explained to the prospective jurors that out-of-court information was lacking in probative value because it was not offered under oath, and was not subject to test by cross-examination. After this explanation and admonition by the court, the juror stated that he felt that he could predicate his verdict solely upon the evidence received during the course of the trial. A challenge for cause to this juror was denied, and because the defense had exhausted their peremptory challenges, he subsequently became a member of the ultimate panel.

Sec. 7, art. I of the Wisconsin constitution requires that the defendant be tried by an impartial jury. Although Fourteenth amendment due process does not require states to provide jury trials in criminal cases, Fourteenth amendment due process does require that the trier of fact, whether judge or jury, be an "impartial tribunal." [11] If persons who were persuaded of the defendant's guilt prior to the commencement of the trial and continued in their belief through the *voir dire,* were permitted to serve as triers of

---

[11] *Irvin v. Dowd* (1961), 366 U. S. 717, 81 Sup. Ct. 1639, 6 L. Ed. (2d) 751; *Tumey v. Ohio* (1927), 273 U. S. 510, 47 Sup. Ct. 437, 71 L. Ed. 749.

fact, these state and federal constitutional requirements would not be met. However, as the United States supreme court has noted, the mere expression of a predetermined opinion as to guilt during the *voir dire* does not disqualify a juror *per se*.[12]

A determination as to the subjective sincerity of this man in expressing his final view of fairness is a matter within the discretion of the trial court. The instant situation is definitely distinguishable from the jury panel in *Irvin v. Dowd, supra,* which the United States supreme court found *not* to be an impartial tribunal and where eight members of the ultimate panel were passed, even though they never retreated from their pretrial opinion that the defendant was guilty.

Under the circumstances, the presence of this particular juror on the ultimate panel did not deny the defendants their right to an impartial tribunal under sec. 7, art. I, Wisconsin constitution, or the Fourteenth amendment.

5. *Were the defendants denied the proper number of peremptory juror challenges?*

The trial court allowed the defendants a total of 18 peremptory challenges to be divided equally between them. They claim that each was entitled to 12 peremptory challenges. The express terms of sec. 957.03, Stats., sustain the ruling by the trial court. The statute provides:

"957.03 PEREMPTORY CHALLENGES. Each side is entitled to only 4 peremptory challenges except as provided otherwise in this section. When the crime charged is punishable by life imprisonment, each side is entitled to 12 peremptory

[12] "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd, supra,* at page 723.

challenges. If there is more than one defendant, the court shall divide the challenges as equally as practicable among them; and if their defenses are adverse and the court is satisfied that the protection of their rights so requires, the court may allow the defendants additional challenges. If the crime is punishable by life imprisonment the total peremptory challenges allowed the defense shall not exceed 16 if there are only 2 defendants and 18 if there are more than 2 defendants; in other cases 6 challenges if there are only 2 defendants and 9 challenges if there are more than 2."

6. *Was the evidence sufficient to sustain a verdict of guilty of first-degree murder and attempted murder as to all defendants?*

The test for determining the sufficiency of evidence to sustain a criminal conviction is whether there is any "credible evidence which in any reasonable view supports a [the] verdict." [13] That is to say, if any rational view of the evidence supports the verdict, this court must sustain it. Therefore, from the point of view of the appellate court, the test for the sufficiency of evidence in a criminal case is equivalent to the test applied in civil cases. The standard of proof beyond a reasonable doubt is *a direction to the jury*. The rationale for this analysis has been described in these terms :

"In reaching the conclusion that the judge committed no error in sending the case to the jury, we have not cited or stressed the well-established rule here that the test for the judge to apply in determining what rational inferences of fact a jury may be permitted to draw from the testimony is the same in civil and criminal cases, because we view the prosecution's case as sufficiently strong to justify the result, whatever nuances of doctrines are applied. But since the rule has been misunderstood and not properly stated, it seems proper to state again that if the jury is to be allowed

[13] *State v. John* (1960), 11 Wis. (2d) 1, 7, 103 N. W. (2d) 304; *State v. Johnson* (1960), 11 Wis. (2d) 130, 104 N. W. (2d) 379.

its historic function as finders of fact—as now stressed by the Supreme Court in many cases, such as *Schulz v. Pennsylvania R. Co.*, 350 U. S. 523, 76 S. Ct. 608—and if it is to be accredited its own proper responsibility as an important agency of law administration, it must also be permitted to make such inferences or deductions from the known data as are common sense under the circumstances. And such basic facts will not vary from civil to criminal cases; . . . To attempt some subtle distinction is to confuse this comparatively simple problem with the question of the proper charge to the jury and the differing standards there applicable in civil and criminal cases." [14]

With this test in view we turn to an evaluation of the evidence in this case. Although the evidence on many crucial facts is in dispute, this court, resolving all issues as to credibility in favor of the view supporting the verdict, must then determine whether the established facts rationally support the ultimate verdict.

On the evening in question, Officer Kohl received a phone call from an employee of the Ishnala supper club, near Lake Delton, informing him that three young men were spending large amounts of money, and further, that at least one of the men had been found walking around in a private section of the club. Kohl and Jantz went to Ishnala to investigate. In the parking lot they found a 1960 Oldsmobile which purportedly belonged to the men in question. They saw

[14] *United States v. Masiello* (2d Cir. 1950), 235 Fed. (2d) 279, 284. The federal system follows the rule of equivalent standards for appellate review of sufficiency of evidence in civil and criminal cases because as Judge LEARNED HAND noted: "But courts—at least federal courts—have generally declared that the standard of evidence necessary to send a case to the jury is the same in both civil and criminal cases; and that, given evidence from which a reasonable person might conclude that the charge in an indictment was proved, the court will look no further, the jury must decide, and the accused must be content with the instruction that before finding him guilty they must exclude all reasonable doubt." *United States v. Feinberg* (2d Cir. 1944), 140 Fed. (2d) 592, 594.

that the car had Illinois license plates and upon checking with Illinois authorities, Kohl discovered that the license plates were not issued to this car. After examining the Oldsmobile more closely, Kohl discovered that one of the license plates in question was superimposed upon another Illinois plate, which was in fact registered to the automobile. After checking the Dell View Hotel where the young men were staying (registered under assumed names), Officers Kohl and Jantz waited on a side road near Ishnala for the men to leave the club. The officers intended to stop the men after they left the club to inquire into the ownership of the automobile.

At approximately 1:30 a. m., the three defendants left Ishnala and, after leaving the club, they traveled in an easterly direction on Highway 12 into the village of Lake Delton. The officers followed. As the cars passed through Lake Delton the officers turned on their red signal light. The Oldsmobile stopped at the curb at a point 25 feet west of the intersection of Highway 12 and Judson street in Lake Delton. The police car stopped five to six feet behind and west of the Oldsmobile. Both cars were parked at the south edge of the highway. The lights of the squad car were on. Both officers were wearing full police uniforms.

Officer Kohl got out of the right side of the police car and stepped onto the curb. As he approached the Oldsmobile, he walked parallel to it. When he reached a position perpendicular to the center post of the Oldsmobile, he turned at right angles and approached the car. At this point, Officer Jantz, the driver of the squad car, was at the left front door of the Oldsmobile.

As Kohl approached the Oldsmobile, the right front and rear doors of that car opened simultaneously. Nutley began to get out of the back door, and Welter came out of the front.

Officer Kohl thought that Nutley was preparing to run away. He grabbed Nutley and turned him toward the car, simultaneously kicking shut the right rear door of the Oldsmobile. Nutley exclaimed, "What's going on here," and pushed Kohl away from him, back toward the curb. As Kohl stepped toward Nutley in an attempt to grab him again, he was shot in the chest by Welter. Kohl directly observed Welter shooting him. Kohl swayed and began to fall. He felt someone grab him around the chest. A voice shouted, "Don't hold him that way, hold him like this," or words to that effect. Kohl felt someone propping him up as he sagged toward the ground. He felt an object pressed against the back of his head, and a voice said, "Drop your gun or I'll put a bullet in the back of your buddy's head." As these words were spoken, Kohl heard several shots.

Kohl then sagged his weight and the person holding him dropped him to the ground. As Kohl lay on the ground, he heard additional shots. He moved from the right rear of the Oldsmobile to a position between the squad car and the Oldsmobile. At this time he observed another squad car proceeding in a westerly direction, stop at the north curb of Highway 12, directly across from the automobiles at the south curb. He called out, in effect, "Don't come close, they have guns."

As Kohl lay between the squad car and the Oldsmobile, he heard the shuffling of feet. Then he heard a car door open and close, and a car drive away. The entire episode, from the time Kohl stepped from the police car until he heard a car drive away, lasted about a minute and a half.

James Agan was another eyewitness to the episode. On the evening in question, he was sitting in the living room of the C-Der-Del Motel located at the southeast corner of the intersection of Judson street and Highway 12.

Agan observed a red light flashing on the street. He looked out the window and saw an automobile and a squad car parked at the south edge of Highway 12, a short distance west of the intersection. The automobile was in front of the police car. He observed a police officer approaching the automobile from the south curb. He observed a person get out of the automobile from the front right side. Then he observed a flash and a report, and observed the officer falling. He also observed a uniformed officer approaching the left side of the lead automobile from the street. At the moment of the flash and report, Agan observed this second officer turn and run behind the right rear fender of the squad car.

Agan then moved from the living-room window to the kitchen door of the motel. At this point, he could observe the scene on the street to the west of the motel. Agan observed two men "struggling" with another man immediately adjacent to the right rear fender of the Oldsmobile. At the same time, he observed another man standing at the front of the Oldsmobile and firing over that car in the direction of the squad car.

After several moments, as the third man fell to the ground, the two men at the right rear fender of the Oldsmobile moved to the right front fender. Agan observed both of these men firing in the direction of the squad car. Return fire came from behind the squad car. Suddenly the firing stopped. Two men moved from the right front of the Oldsmobile around to the right rear of the squad car. Another man moved from in front of the Oldsmobile. along the street to the left rear fender of the squad car. As the two men moving along the curb reached the right rear of the squad car, Agan heard another shot. There was a momentary pause, and then all three men ran to the car. The man moving on the street got into the driver's seat, the others

jumped into the front seat from the curbside. The car drove away, turning left onto Judson. Agan went into the street and found Kohl lying seriously wounded under the front bumper of the squad car. Jantz was lying dead, behind the right rear fender of the police car.

Other witnesses, including the police officer parked on the north curb of Highway 12, heard shots and saw people running on the street. However, none of these people could describe the sequence of events with any degree of coherence or precision.

There was a wild chase before the three men were apprehended.

At about 2 a. m., on August 21st, Officer Donnelly was parked adjacent to the Dell View Hotel, which was approximately three and one-half blocks southeast of the shooting scene. This was the hotel at which the defendants were staying. Donnelly had been notified that a 1960 four-door black hardtop Oldsmobile was involved in the shooting episode in Lake Delton. Donnelly observed the Oldsmobile leave the hotel and proceed back toward the shooting scene. He notified another officer that the car was passing through Lake Delton. The other man, Officer Johnson, who was also in a police car, joined Donnelly, and together the officers tried to stop the Oldsmobile. At one point one police car pulled to the left and slightly ahead of the Oldsmobile. At this time the person sitting in the passenger seat of the Oldsmobile fired a shot through the front windshield at the police car. The Oldsmobile then pulled around the police car and sped down Highway 12, with the police car in hot pursuit. During this chase, conducted at speeds of 100 miles per hour, the police and the passengers in the Oldsmobile exchanged shots.

At one point the Oldsmobile left the road and plunged into the ditch. Officer Johnson stopped his car and proceeded toward the Oldsmobile. Suddenly the car started up

again and moved out of the ditch back onto Highway 12. The chase continued. It terminated in Lyndon Station (about ten miles from Lake Delton), when the Oldsmobile crashed into several parked cars and overturned. When the police looked into the car, they discovered that the occupants had already left the scene. Shortly after the crash, Nickl was found back in the ditch near Hoyles Corner, where the car had left the road. He was shot in the leg.

After several days' search by a posse, Nutley and Welter, who was identified as the driver of the Oldsmobile during the chase, were found in the surrounding area.

A search of the Oldsmobile and the immediate vicinity of the crash revealed the following items: Burglar tools; three guns wrapped in a blanket in a suitcase; a 25-caliber automatic and three 38-caliber pistols, one being Officer Kohl's gun.

Two 38-caliber pistols were found lying in the ditch adjacent to Nickl, one being Officer Jantz's gun. Twenty-five-caliber and 38-caliber ammunition was found in the pocket of the sports coat Nickl was wearing. Several expended cartridge cases were found in the car.

Ballistic experts from the state crime laboratory testified in relation to the weapons and bullets as follows: Based upon their observation of cylinder flares on the 38-caliber pistols, and carbon deposits in the chamber and on the slide of the clip-fed weapons, they concluded that of the nine weapons found, three had been recently fired: Officer Jantz's weapon, Officer Kohl's weapon, and a 38-caliber pistol, identified as Exhibit 52. Each had been fired three times; each had a remaining load of three rounds.

Physicians who had treated Kohl and Nickl, and performed the autopsy on Jantz, testified that upon removing the bullets from these men they immediately turned the missiles over to the personnel of the state crime laboratory. The physician who performed the autopsy on Jantz testi-

fied that the officer had been shot three times: (1) In the right lower back, (2) through the right side of his skull, the bullet lodging in the brain, and (3) through the left side of his face. Either wound one or two could have been fatal.

The ballistics experts, relying upon standard ballistic tests, traced the various bullets to different guns.

(1) Officer Jantz's back wound and skull wound, and Officer Kohl's chest wound, were. caused by bullets fired from Exhibit 52 (later identified as the gun fired by Welter).

(2) Nickl's leg wound, and Jantz's face wound were caused by bullets fired from Jantz's gun. The bullet causing Jantz's facial wound was not found in his body. Rather it was found by a small boy in the immediate vicinity of the shooting.

(3) A bullet from Kohl's gun was found about one half a block to the right rear of the squad car.

(4) Three expended cartridges from Kohl's gun were found in the Oldsmobile in Lyndon Station; one cartridge from Jantz's gun was found in the Oldsmobile.

Does this factual picture permit a reasonable juror to conclude that each defendant was guilty of the offenses charged either as a principal or alternatively as an aider and abettor, or conspirator?

Before determining this question we must clarify the theory of substantive liability as an aider and abettor, or alternatively, substantive liability as a conspirator.

*Aiding and Abetting.*

Under the terms of sec. 939.05 (2) (b) and (c), Stats., a person may be vicariously liable for a substantive crime directly executed by another. Under the complicity theory of sec. 939.05 (2) (b), a person is liable for the substan-

tive crime committed by another if (1) he undertakes conduct (either verbal or overt action) which as a matter of objective fact aids another person in the execution of a crime, and further if (2) he consciously desires, or "intends" that his conduct will yield such assistance.[15] He must consciously direct his conduct toward the realization of the criminal objective. He must have a "stake in the outcome." [16]

However, it is not necessary that the aider and abettor enter into an agreement with the perpetrator to assist him in consummation of the crime. Nor is it necessary that the perpetrator be aware of the accomplice's efforts, in order to hold the accomplice liable for the substantive crime. In *State v. Talley* [17] a group of men in one town set out to kill a particular person who lived in another town. The friends of the victim, hearing of the plot against him, attempted to warn him by sending him a telegraph message. Another person, a judge, who also disliked the potential victim, directed the telegraph operator to destroy the message, telling him it was unimportant. The judge was held liable for murder under the complicity theory, even though the perpetrators were not aware of his assistance until after they consummated the crime.

### Conspiracy.

Under the conspiracy theory of sec. 939.05 (2) (c), Stats., a person may be vicariously liable for the substantive crime of another under either of two circumstances.

(1) The parties may enter into an agreement to commit a particular crime. The fact of agreement imposes liability for the substantive offense on all conspirators when the crime is consummated by a single perpetrator.

---

[15] *Mandella v. State, supra.*
[16] *United States v. Peoni* (2d Cir. 1938), 100 Fed. (2d) 401.
[17] (1894), 102 Ala. 25, 15 So. 722.

(2) During the course of executing the crime on which there is agreement, one person commits another crime which is, objectively, the natural and probable consequence of the agreed-upon crime. Under these circumstances, the fact of agreement renders all parties liable for the incidental crime.[18]

The rationale for the conspiracy theory recognizes that the fact of agreement materially reinforces the desire of the parties to carry out their portion of the division of criminal labor. Since each conspirator psychologically reinforces the conduct of the overt perpetrator, each is justly held responsible for his substantive crime.[19]

The elements of conspiracy are:

(1) An agreement among two or more persons to direct their conduct toward the realization of a criminal objective.[20]

(2) Each member of the conspiracy must individually consciously intend the realization of the particular criminal objective. Each must have an individual "stake in the venture." [21]

We now apply these legal principles to the facts surrounding the conduct of each defendant in this case.

A. *The Liability of William Welter.*

The evidence is legally sufficient to convict Welter of first-degree murder and attempted murder, as a principal.[22] Kohl testified that he observed Welter shooting him; the

[18] *State v. Bachmeyer* (1945), 247 Wis. 294, 19 N. W. (2d) 261; *Pollack v. State, supra.* A similar conspiracy theory exists in the federal system. *Pinkerton v. United States* (1946), 328 U. S. 640, 66 Sup. Ct. 1180, 90 L. Ed. 1489.

[19] See generally *Developments in the Law—Criminal Conspiracy,* 72 Harvard Law Review (1959), 922, 998, 999.

[20] *O'Neil v. State* (1941), 237 Wis. 391, 296 N. W. 96; *Pollack v. State, supra.*

[21] *Direct Sales Co. v. United States* (1943), 319 U. S. 703, 63 Sup. Ct. 1265, 87 L. Ed. 1674.

[22] Sec. 939.05 (2) (a), Stats.

bullet in Kohl came from the same gun that fired the fatal shots into Jantz. Although it is possible that Welter could have given this weapon (Exhibit 52) to another person, the jury could reasonably have believed otherwise in view of Agan's testimony that he saw three men firing from a covered position near the Oldsmobile at another man (Jantz) covered by the squad car.

B. *The Liability of Nutley and Nickl for the Death of Jantz.*

The evidence is legally sufficient to convict Nutley and Nickl for the death of Jantz, under the complicity theory of sec. 939.05 (2) (b), Stats.

Kohl testified that after he was shot by Welter, another person grabbed him, propped him up, pressed an object to the back of his head, and said in effect, "Drop your gun or we will kill your buddy." The jury could believe that Nutley, placed adjacent to Kohl at this time by Kohl's testimony, had used Kohl as a shield, removed Kohl's gun from his holster and attempted to neutralize Jantz's counterfire by threatening to kill Kohl. Moreover, Agan's testimony would support an inference that Nutley was firing at Jantz. A bullet from Kohl's gun was found to the right rear of the squad car.

Again, Agan's testimony supported an inference that Nickl was firing at Jantz over the top of the Oldsmobile.

This conduct made each man an aider and abettor under the complicity theory. By threatening to kill Kohl unless Jantz dropped his gun, Nutley could well have prevented Jantz from taking efficient steps to protect himself. The jury could have inferred that as two men struggled with Kohl at the right rear fender, they were exposed to a person at the left rear of the squad car. However, Jantz may well have been unwilling to fire at these men, fearing that the person making the threat would carry out the threat, if

he (Jantz) did not hold his fire. Jantz's indecision at that point could well have been a significant causal factor in his death.

The volume of firepower generated by three men, rather than one, could also be deemed a significant causal factor in Jantz's death. A man being fired upon from different angles cannot effectively cope with the danger. His attention is continually distracted as he is exposed from both the front and his right side. Moreover, being caught in such circumstances may well have produced anxiety in Jantz that adversely affected any counteraction on his part. The sheer volume of firepower was a significant factor in Jantz's death. The most probable explanation of Jantz's wounds, is that he was struck in the head during the intense volley. When Jantz did not return fire, Welter and Nutley moved down the right side of the squad car. Welter fired another shot striking Jantz in the right lower back.

Ballistic experts testified that only three weapons were recently fired—Jantz's, Kohl's, and one traced to Welter. The evidence could reasonably support an inference that Nutley was firing Kohl's gun. However, at first glance it appears as though physical evidence contradicts the testimony of Agan that he saw three men firing. But is this so? The testimony of the experts was based upon their observation of cylinder flash marks or powder marks and the presence of carbon deposits—material that can be wiped away. The defendants had an opportunity to clean and reload their weapons after the shooting episode and before the chase. There was evidence that the weapons were reloaded. When Kohl's gun was found adjacent to the Oldsmobile at Lyndon Station, it had three loaded rounds, three rounds had been fired. Three spent cartridges from Kohl's gun were found in the car; one bullet from Kohl's gun was found at the shooting scene in Lake Delton. Therefore, a

total of at least four rounds had been fired from Kohl's weapon at the shooting scene and during the entire chase from Lake Delton to Lyndon Station. A fully loaded 38-caliber pistol holds six rounds. If a total of four rounds was fired, and three loaded rounds were found in the weapon at Lyndon Station, it would follow that at some time the weapon was reloaded. If the defendants were re-loading some weapons, it is reasonable to infer that they were cleaning others.

Therefore, the jury could reasonably find that the conduct of these men as a matter of objective fact was a cause of Jantz's death. Since the death was a probable consequence of the conduct, the jury could infer that Nutley and Nickl intended the consequences of their actions.

C. *The Liability of Nutley and Nickl for the Attempted Murder of Kohl.*

Given the circumstances surrounding the shooting of Kohl, there is little evidence that Nutley or Nickl aided or abetted Welter in this crime. However, the jury could reasonably predicate their liability upon the conspiracy theory of sec. 939.05 (2) (c), Stats.

The jury could reasonably believe that at the time the Oldsmobile was stopped by Jantz and Kohl in Lake Delton, the three defendants entered into an agreement to resist any apprehension by the police officers, by force if necessary.[23] Under these circumstances, Kohl's shooting was the natural and probable consequence of such an agreement. The fact of agreement may be demonstrated by circumstantial evidence.

The presence of the burglar tools and a number of weapons could support an inference that these men wanted to avoid any contact with police officers. Therefore, when stopped by what was obviously a squad car, an inference

---

[23] Sec. 946.41, Stats.

could logically arise that they agreed to resist. Their conduct at the shooting scene may be reasonably viewed as the kind of co-ordinated activity that follows from a prior agreement. Nutley and Welter got out of the car simultaneously, thus placing maximum pressure upon Kohl. Immediately, after Kohl was shot, the evidence permits the inference that Nutley used Kohl as a shield to place pressure upon Jantz. The evidence also supports the inference that contemporaneously with the shooting of Kohl, Nickl took up a position in front of the Oldsmobile and began firing at Jantz. Also, all three men simultaneously ran to the back of the squad car when it appeared Jantz was shot. The entire transaction lasted a minute and a half. Although they may not have specifically agreed to kill the officers while sitting in their car, this co-ordinated conduct is evidence of an agreement to jointly resist and use whatever means where necessary to avoid apprehension. Whether Kohl or Jantz, in fact, intended to arrest these men upon stopping them is immaterial. From the point of view of the men in the car, the officers may well have been intending arrest as they moved toward the car. When Kohl grabbed Nutley without any other preliminaries, all defendants could have concluded that only violence could avoid apprehension. Therefore, the shooting of Kohl was a natural and probable consequence of the agreement to resist.

We conclude, therefore, that the evidence is legally sufficient to convict Welter of both crimes as a perpetrator, and to convict Nutley and Nickl of the murder of Jantz as conspirators or accomplices, and of the attempted murder of Kohl as conspirators.

Each defendant argues that if his liability is predicated upon his role as a conspirator, then his life sentence is excessive as a matter of law. Each relies upon the provi-

sions of sec. 939.31, Stats.[24] This argument ignores the distinction between conspiracy as a substantive *inchoate* crime, and conspiracy as a theory of prosecution as a principal for a substantive *consummated* crime. If the defendants had agreed to kill the officers, and did only one thing to carry out this plan but short of shooting to kill or to attempt to kill, they could have been convicted under the terms of sec. 939.31 of a conspiracy to commit murder and the sentencing provisions of this statute would have been relevant. Here they were convicted of a substantive crime, in part, at least, on the theory that they were conspirators and hence were guilty, as principals, of the crimes charged.

*7. Was the trial conducted in such an unfair manner as to deny the defendants their right to an impartial tribunal?*

The defendants argue that when they took the stand in their own behalf, the court subjected them to close cross-examination which created the image of guilt in the jurors' eyes. The defendants argue that this conduct by the court was improper and denied them an impartial tribunal.

Essentially, the court questioned each defendant in relation to internal inconsistencies in his own version of the episode, and inconsistencies between his version and the version offered by his codefendants. At no time did the court overtly express disbelief of any defendant.

As to the propriety of the court examining witnesses in order to clarify ambiguities or uncertainties, Federal Judge LEARNED HAND, speaking for the court of appeals for the Second circuit, has stated:

---

[24] "939.31 CONSPIRACY. Whoever, with intent that a crime be committed, agrees or combines with another for the purpose of committing that crime may, if one or more of the parties to the conspiracy does an act to effect its object, be fined or imprisoned or both not to exceed the maximum provided for the completed crime; except that for a conspiracy to commit a crime for which the penalty is life imprisonment, the actor may be imprisoned not more than 30 years."

"It is permissible, though it is seldom very desirable, for a judge to call and examine a witness whom the parties do not wish to call. A judge is more than a moderator; he is charged to see that the law is properly administered, and it is a duty which he cannot discharge by remaining inert." [25]

Justice FRANKFURTER, speaking for the United States supreme court on the subject (albeit in dissent) said:

"While a court room is not a laboratory for the scientific pursuit of truth, a trial judge is surely not confined to an account, obviously fragmentary, of the circumstances of a happening, . . . A trial is not a game of blind man's buff; and the trial judge—particularly in a case where he himself is the trier of the facts upon which he is to pronounce the law—need not blindfold himself by failing to call an available vital witness simply because the parties, for reasons of trial tactics, choose to withhold his testimony.

"Federal judges are not referees at prize-fights but functionaries of justice. . . . he has the power to call and examine witnesses to elicit the truth. See *Glasser v. United States,* 315 U. S. 60, 82. He surely has the duty to do so before resorting to guesswork in establishing liability for fault." [26]

If trial courts may, on their own initiative, call witnesses in order to obtain relevant testimony, *a fortiori,* a trial court may question a witness called by the parties in order to clarify received testimony, providing the court does not overtly express his view of the matters in issue. While the court cannot function as a partisan, it may take necessary steps to aid in the discovery of truth. The trial court's examination of these defendants was a justified attempt to clarify a relevant and highly material line of inquiry. [26a]

---

[25] *United States v. Marzano* (2d Cir. 1945), 149 Fed. (2d) 923, 925.

[26] *Johnson v. United States* (1948), 333 U. S. 46, 53, 54, 68 Sup. Ct. 391, 92 L. Ed. 468.

[26a] *Schroeder v. State* (1936), 222 Wis. 251, 267 N. W. 899; *Lowe v. State* (1903), 118 Wis. 641, 96 N. W. 417.

8. *Are the defendants entitled to a new trial in the interest of justice, because of certain evidentiary errors during the course of the trial?*

The defendants' request for a view of the Lake Delton site was denied. Under the provisions of sec. 957.08, Stats., the decision to grant a view is within the discretion of the trial court. The primary purpose of the request for a view was to test the credibility of Agan's testimony that from the kitchen doorway of the C-Der-Del Motel he observed three men in the vicinity of the Oldsmobile firing at another man positioned behind the squad car.

However, Agan was closely cross-examined on his testimony. Moreover, the defense offered certain documentary and mathematical proof, calculated to demonstrate that it was physically impossible to have made the claimed observations. Because substantial evidence on this issue was presented to the trier of fact, the denial of the view was within the discretion of the trial court.

The defendants argue that it was error to deny them the right to conduct independent ballistics examinations in the absence of officials from the state crime laboratory.

The trial court was willing to permit the defense to conduct independent ballistics examinations of the relevant weapons and bullets, providing a ballistic expert from the state crime laboratory was present during these tests. The defense refused the condition.

The defense argument that the condition was unreasonable implicitly assumes that the experts from the state crime laboratory were partisan advocates, and that their presence during the defense tests somehow would violate the tenets of the adversary system. This is not the case. The personnel and facilities of the state crime lab are available to both the prosecution and the defense. Because ballistic science is a relatively exact, physical-science discipline, where there is

a common methodology, it was reasonable for the court to require the defense to let the ballistic experts of the state crime lab view the defense tests.

Had the defense requested an independent observer present at the state crime lab tests, and had the court granted such request, the prosecution could not claim error. The trial court's condition for an independent examination was reasonable.

Finally, defendant Nickl claims that he was denied an opportunity to successfully impeach witness Rafferty by showing Rafferty's history of mental illness. After the trial court had explained to the triers of fact (the jury) that evidence of the jailbreak attempt by Nutley and Welter was not relevant to the guilt of Nickl, the state offered evidence, through the testimony of Rafferty, a fellow prisoner, of an attempted jailbreak by Nickl.

Nickl's attorney attempted to impeach Rafferty by offering proof of a history of mental illness. This line of inquiry was foreclosed by the trial court. Nevertheless, through interchanges between the court and defense counsels, it was communicated to the jury that Rafferty had spent time in a mental hospital. In any event, the entire inquiry was of questionable relevance to Nickl's liability in the offenses charged, and a new trial cannot be predicated upon this transaction.

The defendants further argue that prior to the impaneling of the jury, they were brought to the courtroom in chains and manacles (although they were taken off when the defendants reached the courtroom), and further that in these opening stages of the trial, a police dog was present in the courtroom as a security measure. It is argued that because these events occurred in the presence of persons who ultimately became members of the final jury panel, they were denied their right to an impartial tribunal. Again, this was a matter which could have been explored on *voir*

*dire,* and if a juror was irreversibly prejudiced by what defendants consider to be these images of guilt, he could have been challenged for cause. Neither the dog nor the chains were present once the jury was impaneled and the prosecution began its case. Ordinarily, there can be no justification for having a police dog in the courtroom, but we are not prepared to hold that a new trial should be granted here because of the failure to remove the police dog in the preliminary stages of the trial.

The defendants also contend that the weapons and ammunition which were evidence in this matter were stored in an orange-colored steel cage, which was kept locked at all times except when the exhibits were being handled by the attorneys or witnesses. They argue that this extraordinary method of handling the exhibits was constant extrajudicial "evidence" of their guilt. Shortly before the commencement of the trial, defendants Nutley and Welter attempted to break out of Dane county jail. They beat one officer and threatened to kill another. Under these circumstances, locked storage of the weapons was a reasonable security provision. We realize that the presence of this conspicuous cage in the courtroom before evidence of the jailbreak was offered by the state, assumes to a degree the matter at issue. The better procedure is to offer evidence of security risk initially, and then install the security precautions after a *prima facie* showing of danger. The failure to utilize this procedure here does not warrant a new trial under all the circumstances of this case.

9. *Were the defendants denied an impartial trial because of a deep-seated pattern of community prejudice engendered by pretrial publicity?*

The United States supreme court has held that even if a defendant has examined prospective jurors at length during a *voir dire,* and even if the jurors state that they will evaluate the issues only on the evidence presented during the trial, a

defendant may still be denied a fair trial if prejudicial pretrial publicity is of such quantitative and qualitative magnitude that it is probable that the jurors predetermined the issue despite their protestations to the contrary.[27] This rule of Fourteenth amendment due process is applicable even though the defendant may have received one change of venue, pursuant to a state statute similar to sec. 956.03, Stats.[28]

The only evidence of prejudicial pretrial publicity produced in this case consists of several newspaper articles describing the escape attempt of Welter and Nutley, and one newspaper article printed during the period of selecting the jury. All other exhibits offered by the defendants were printed during the progress of the trial when the jury was insulated from the mass media.

The accounts of the jailbreak included statements by the officers who were beaten and threatened, and various admissions by the defendants.

The other newspaper article reported the prior convictions of Nutley and Nickl for robbery. It also contained a report that Welter had been arrested for robbery in Illinois, and that Illinois police suspected that Nickl had shot at police officers on several occasions when they attempted to apprehend him during the commission of robberies and burglaries. Finally the report noted that Welter and Nickl, who are cousins, came from well-to-do backgrounds.

We are of the opinion that this data does not approach the type of pretrial publicity that was present in *Irvin* or *Rideau*. In *Irvin*, not only did newspapers in the area release statements relating Irvin's previous convictions, but

[27] *Irvin v. Dowd, supra. Rideau v. Louisiana* (1963), 373 U. S. 723, 83 Sup. Ct. 1417, 10 L. Ed. (2d) 663.
[28] *Irvin v. Dowd, supra.*

they released numerous copies of his confession to the crime in issue. Newspaper editorials and cartoons affirmed his guilt. Newspapers even released the results of a public-opinion poll on the issue of guilt or innocence (the majority vote was "guilty").

In *Rideau* a local television station produced a filmed rendition of the defendant's confession to the police. It was clearly a trial by television.

In the case at bar, the pretrial publicity, while serious, is not of such magnitude, quantitatively or qualitatively, to permit us to infer that the jurors could not help but pre-determine the issue.

We wish to add, however, that this court is concerned with the increasing tendency of the mass media, at the in-stance of the prosecution or otherwise, to publish confessions, prior convictions, suspicions—in short, evidence which may be inadmissible on trial but which will be highly prejudicial to a defendant's efforts to receive a fair trial.

10. *Was Nickl's counsel denied the opportunity to con-sult with the other defendants and their counsel before the trial?*

Counsel for defendant Nickl argued by affidavit in his motion for a new trial that he (counsel) was denied an effective opportunity to confer with the other defendants and their counsel until three days before the trial. The state denies this. In any event, at the opening of the trial (which would have been the appropriate time), counsel did not move for a continuance of the trial on these grounds, and is therefore precluded from raising the issue now.

11. *Was it necessary for Nickl and Nutley to make their motions for a new trial prior to judgment?*

The state argues that the order which denied Nutley and Nickl a new trial must be affirmed because, it contends, a

motion for a new trial in a criminal case must be made before judgment and sentence. Although we affirm the order on its merits, the procedural rule is of sufficient importance so that we deem it advisable to point out the error of the state's argument.

The applicable statute is sec. 958.06 (1), which provides in part that, "Within one year after the trial and on motion of the defendant the court may grant a new trial . . ." Sub. (2) expressly provides for review by writ of error of an order refusing a new trial.

The state relies on *Hogan v. State* (1874), 36 Wis. 226, which did hold that under sec. 6 of ch. 180, R. S. 1858, the forerunner of sec. 958.06 (1), Stats., a motion for a new trial could not be made after judgment. Four years later, however, the Revised Statutes of 1878 were enacted. The substance of sec. 6 of ch. 180 appeared in sec. 4719, except the words "before or after judgment" were inserted. Thus the holding in *Hogan* was no longer the law. These words remained in the law until the revision of criminal procedure by ch. 631, Laws of 1949. In the revision of the section, then numbered 358.06, the language was rearranged in several particulars, and the words "before or after judgment" were omitted. We have no doubt that this omission within the process of revision reflected the thought that the words were unnecessary rather than any intent to return to the rule of *Hogan*.

The state has also cited *O'Toole v. State* [29] and *Ferry v. State* [30] in support of its assertion that the motion for a new trial could not be made after judgment. In both these cases this court was reviewing the judgment brought here by writ of error. Their holding is best set forth in a quotation from *O'Toole,* at page 20 :

[29] (1899), 105 Wis. 18, 80 N. W. 915.
[30] (1953), 266 Wis. 508, 63 N. W. (2d) 741.

"The first and third assignments of error are predicated upon insufficiency of the evidence to support the verdict. They cannot be considered in the absence of a motion to set aside the verdict and grant a new trial on that ground, made before sentence and judgment. True, a motion to set aside the judgment and grant a new trial was made and denied by order after judgment. Such motion and order, however, are not brought up for review by writ of error to the judgment."

We find no intimation in these cases that a motion for a new trial could not be made after judgment, and the denial thereof brought here by appropriate writ of error (and now appeal).[31]

As this opinion reveals, this was a long and complex trial involving the most difficult and close legal, as well as factual, issues. We are persuaded that each of the defendants received a fair trial and that justice was done.

*By the Court.*—Judgments of conviction and sentencing of William Welter, Lawrence Nutley, and Richard M. Nickl affirmed. Order denying motions for new trial by Lawrence Nutley and Richard M. Nickl affirmed.

BEILFUSS, J., took no part.

---

[31] See *Ullman v. State, supra.*